# NATIONAL LABOR RELATIONS BOARD *v.* INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL 340

No. 85–1924.   Argued February 25, 1987—Decided May 18, 1987

574

BRENNAN, J., delivered the opinion of the Court, in which MARSHALL, BLACKMUN, POWELL, and STEVENS, JJ., joined. SCALIA, J., filed an opinion concurring in the judgment, *post*, p. 596. WHITE, J., filed a dissenting opinion, in which REHNQUIST, C. J., and O'CONNOR, J., joined, *post*, p. 598.

*Jerrold J. Ganzfried* argued the cause for petitioner. With him on the briefs were *Solicitor General Fried, Deputy Solicitor General Cohen, Norton J. Come,* and *Linda Sher.*

*Laurence J. Cohen* argued the cause for respondent. With him on the brief were *Larry D. Silver, Kathryn A. Sure, Mark S. Renner,* and *Laurence Gold.**

JUSTICE BRENNAN delivered the opinion of the Court.

The question for decision is whether a union "restrain[s] or coerce[s] . . . an employer in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances," 29 U. S. C. § 158(b)(1)(B), when it disciplines a supervisor union member who does not participate in collective bargaining or adjust contractual grievances, and whose employer has not entered into a collective-bargaining agreement with the union.

I

Royal Electric (Royal) and Nutter Electric (Nutter) are members of the National Electrical Contractors Association (NECA). In May 1981, the last in a series of collective-bargaining agreements between NECA and the International Brotherhood of Electrical Workers, Local 340 (IBEW or Union), expired. Negotiations for a new agreement failed shortly thereafter, and the Union struck all NECA employers, including Royal and Nutter.

---

*Mark R. Thierman* filed a brief for the Sacramento Valley Chapter of the National Electrical Contractors Association, Inc., et al. as *amici curiae* urging reversal.

*David M. Silberman* filed a brief for the American Federation of Labor and Congress of Industrial Organizations as *amicus curiae* urging affirmance.

The strike lasted several months. On September 15, 1981, the Union sent NECA a disclaimer of interest "in representing . . . the employees of the multi-[employer] bargaining unit previously established," 271 N. L. R. B. 995, 996 (1984); NECA accepted the disclaimer the following day. The Union then filed petitions seeking to represent the employees of 17 NECA members in single-employer units. Neither then nor thereafter did the Union file a petition to represent the employees of Royal or Nutter.

The Union's attempt to represent the employees of single-employer units was unsuccessful. On October 1, 1981, NECA signed an agreement with the National Association of Independent Unions (NAIU). Royal and Nutter adopted NECA's agreement with NAIU.

The unfair labor practice charges in this case arise from the Union's imposition of fines on two of its members, Albert Schoux and Ted Choate, who work as supervisors for Royal and Nutter respectively. In the fall of 1982, internal Union charges were filed against Schoux and Choate, alleging that they had violated the Union's constitution by working for employers that did not have a collective-bargaining relationship with the Union.[1] Each was found guilty as charged; Schoux was fined $8,200 and Choate $6,000.

Royal and Nutter then filed unfair labor practice charges against the IBEW, alleging that, by fining Schoux and Choate, the Union had restrained or coerced Royal and Nutter "in the selection of [their] representatives for the purposes of collective bargaining or the adjustment of grievances" in violation of § 8(b)(1)(B) of the National Labor Relations Act (NLRA or Act), as amended, 61 Stat. 140, 29 U. S. C. § 158(b)(1)(B). The Administrative Law Judge (ALJ) agreed. First, he found that Schoux and Choate were

---

[1] The Constitution of the IBEW forbids members to "[w]or[k] for, or on behalf of, any employer . . . whose position is adverse or detrimental to the I. B. E. W." App. 152.

supervisors within the meaning of § 2(11) of the NLRA.[2] He then relied on the so-called "reservoir doctrine" to find that they were also part of the narrower category of "[employer] representatives for [the purposes of] collective bargaining or grievance adjustment" covered by § 8(b)(1)(B), despite the fact that neither performed such duties. 271 N. L. R. B., at 997 and 998. Under the reservoir doctrine, the National Labor Relations Board (NLRB or Board) expansively interprets the phrase "representativ[e] for the purposes of collective bargaining or the adjustment of grievances" to include all supervisors within the meaning of § 2(11), on the ground that "such individuals form the logical 'reservoir' from which the employer is likely to select his representatives for collective bargaining or grievance adjustment." *Id.*, at 997. The fact that a supervisor might be selected to perform these tasks in the future is therefore sufficient to classify him or her as a § 8(b)(1)(B) representative.

The ALJ further determined that, even aside from the reservoir doctrine, Schoux was a § 8(b)(1)(B) employer representative because he "granted employees time off and resolved personal complaints or problems regarding job assignments." *Ibid.* The ALJ relied on the Board's broad interpretation of the term grievances "as used in both Section 2(11) and Section 8(b)(1)(B) so as to include not only contractual grievances but also personal grievances." *Ibid.*

On this reasoning, the ALJ held that Schoux and Choate acted as grievance-adjustment or collective-bargaining representatives for their employers under § 8(b)(1)(B). He found that "'the reasonably foreseeable and intended effect of [the

---

[2] "The term 'supervisor' means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibility to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment." 29 U. S. C. § 152(11).

Union's] discipline is that the supervisor-member will cease working'" for the nonsignatory employer, "'thereby depriving the employer of the grievance adjustment services of his chosen representative.'" *Id.*, at 1000 (quoting *Plumbers Local 364*, 254 N. L. R. B. 1123, 1125 (1981)). Consequently, the ALJ decided that, by fining Schoux and Choate for working for Royal and Nutter, the Union had restrained and coerced the employers in the selection of representatives for grievance adjustment and collective bargaining. 271 N. L. R. B., at 1000 and 1002.

Finally, the ALJ rejected the Union's argument that no violation of § 8(b)(1)(B) could occur when a union did not have a collective-bargaining relationship with the employer at the time the supervisor-member was disciplined. IBEW argued that a union which neither represented nor intended to represent the employees of a company had no incentive to influence the company's choice of representative, or to affect the performance of grievance-adjustment or collective-bargaining duties. The ALJ rejected this argument for two reasons. First, he concluded that it was irrelevant that the Union did not intend to interfere with the employer's relationship with its § 8(b)(1)(B) representatives, because the discipline could nonetheless have the *effect* of forcing the representative to quit, depriving the employer of his or her services. Second, he determined that the argument was inapplicable in this case because the Union *did* seek to represent the employees of Royal and Nutter at some future date. *Id.*, at 1002.

The NLRB adopted the ALJ's findings and conclusions. It ordered the Union to rescind the fines levied on Schoux and Choate, to expunge from their records the disciplinary action taken against them, and to post appropriate notices. On November 8, 1984, the Board sought enforcement of its order in the Court of Appeals for the Ninth Circuit.

The Court of Appeals agreed with the NLRB's conclusion that Schoux and Choate were representatives of the em-

ployer for the purposes of § 8(b)(1)(B).   It rejected, however, the Board's conclusion that the Union did, in fact, intend to represent the employees of Royal and Nutter.[3]   As a result, the court reversed the finding of a § 8(b)(1)(B) violation, holding that "when a union does not represent or intend to represent the complaining company's employees[,] there can be no Section 8(b)(1)(B) violation when a union disciplines members even if they are designated bargaining representatives." 780 F. 2d 1489, 1492 (CA9 1986).   The court relied on its previous decision in NLRB v. *International Brotherhood of Electrical Workers*, 714 F. 2d 870, 871 (CA9 1980), where it had reasoned that a union that does not represent or intend to represent a company's employees "ha[s] no incentive to either influence [the employer's] choice of bargaining representatives or affect [the supervisor-member's] loyalty to [the employer]."   We granted certiorari, 479 U. S. 811 (1986), to resolve a conflict in the Circuits.[4]   We now affirm.

---

[3] We uphold the rejection of the NLRB's conclusion that the Union had demonstrated an intent to represent the employees of Royal and Nutter. The Court of Appeals stated:

"We hold that where a Union has filed a disclaimer of interest, and has made no subsequent organizing efforts, its discipline of members fully a year after the termination of the bargaining relationship between the Union and the employers cannot reasonably be construed as an effort to restrain or coerce the employer.   We require some evidence of specific overt acts such as picketing, handbilling, making statements of interest to the employers, or passing out opposition cards to find a desire to represent these particular employees.   Here there was no evidence of such an intent . . . ."   780 F. 2d 1489, 1492–1493 (CA9 1986).

[4] The Court of Appeals for the Eleventh Circuit has held that even if a union does not represent or intend to represent a company's employees, discipline that pressures a supervisor-member to cease working for a non-union company violates § 8(b)(1)(B).   *NLRB* v. *International Brotherhood of Electrical Workers*, 703 F. 2d 501 (1983).   In the present case, and in *NLRB* v. *International Brotherhood of Electrical Workers*, 714 F. 2d 870 (1980), the Court of Appeals for the Ninth Circuit reached the opposite conclusion.

## II

We first review the Court of Appeals' holding that Schoux and Choate were § 8(b)(1)(B) employer representatives. To address this issue, it is first necessary to retrace briefly the treatment of § 8(b)(1)(B) by the Board and this Court.

Section 8(b)(1)(B) of the NLRA provides:

> "It shall be an unfair labor practice for a labor organization or its agents —
>
> "(1) to restrain or coerce . . . (B) an employer in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances."

This section was enacted to prevent a union from exerting direct pressure on an employer to force it into a multiemployer bargaining unit or to dictate its choice of representatives for the settlement of employee grievances. S. Rep. No. 105, 80th Cong., 1st Sess., pt. 1, p. 21 (1947).

For two decades after enactment, the Board construed § 8(b)(1)(B) to prohibit only union pressure applied directly to the employer and intended to compel it to replace its chosen representative. In 1968, however, the Board substantially extended § 8(b)(1)(B) in *San Francisco-Oakland Mailers' Union No. 18 (Northwest Publications, Inc.)*, 172 N. L. R. B. 2173 *(Oakland Mailers)*. The NLRB held that a union violates § 8(b)(1)(B) when it disciplines an employer representative for the manner in which his or her § 8(b)(1)(B) duties are performed. The Board reasoned that the union "interfer[ed] with the [employer's] control over its representatives" by attempting "to compel the employer's foremen to take prounion positions in interpreting the collective bargaining agreement," because the employer "would have to replace its foremen or face *de facto* nonrepresentation by them." *Id.*, at 2173–2174. Hence, the Board concluded that union pressure designed to alter the manner in which an employer representative performs § 8(b)(1)(B) functions coerces the employer in its selection of that § 8(b)(1)(B) representative.

This decision extended § 8(b)(1)(B) in two ways. First, it prohibited *indirect* coercion of the employer's selection of a representative that might result from union pressure on the employer representative. Second, it suggested that contract interpretation is so closely related to collective bargaining that it, too, is a § 8(b)(1)(B) activity. This Court has since indicated that the Board's expansion of § 8(b)(1)(B) in *Oakland Mailers* was at best "within the outer limits" of the section. *Florida Power & Light Co.* v. *Electrical Workers*, 417 U. S. 790, 805 (1974).

In the meantime, however, subsequent decisions of the NLRB further extended § 8(b)(1)(B) to prohibit union discipline of employer representatives for the manner in which they performed supervisory functions *other than* collective bargaining, contract interpretation, and grievance adjustment. In the Board's view, "disciplining . . . a supervisor whenever he was engaged in management or supervisory activities, even though his collective-bargaining or grievance-adjustment duties were not involved" would have the same coercive effect as disciplining an employer representative engaged in § 8(b)(1)(B) duties. *Id.*, at 802. Section 8(b)(1)(B) became, in the eyes of the Board, "a general prohibition of a union's disciplining supervisor-members for their conduct in the course of representing the interests of their employers." *Ibid.*

In *Florida Power*, this expansion came to an abrupt halt; indeed a retreat was called. The Court held that § 8(b)(1)(B) cannot be read to prohibit discipline of employer representatives for performance of rank-and-file work during a strike. The decision created a restrictive "adverse-effect" test to determine when § 8(b)(1)(B) is violated:

> "Nowhere in the legislative history is there to be found any implication that Congress sought to extend protection to the employer from union restraint or coercion when engaged in any activity other than the *selection* of its representatives for the purposes of collective

bargaining and grievance adjustment. The conclusion is thus inescapable that a union's discipline of one of its members who is a supervisory employee can constitute a violation of § 8(b)(1)(B) *only when that discipline may adversely affect the supervisor's conduct in performing the duties of, and acting in his capacity as, grievance adjuster or collective bargainer on behalf of the employer.*" 417 U. S., at 804–805 (emphasis added).

The Court then found that the union's discipline of employer representatives who crossed a picket line to do struck work could not adversely affect performance of § 8(b)(1)(B) duties. In so finding, the Court stressed that the employer representatives "were not engaged in collective bargaining or grievance adjustment, or in any activities related thereto." *Id.*, at 805.

The Court's language implicitly limited the application of the adverse-effect test: an adverse effect on future § 8(b)(1)(B) activities exists *only* when an employer representative is disciplined for behavior that occurs *while he or she is engaged in § 8(b)(1)(B) duties*—that is, "collective bargaining or grievance adjustment, or . . . any activities related thereto." *Ibid.*[5] This conclusion is supported by

---

[5] Commentators agree that the test has this limited scope. See, *e. g.*, Comment, Section 8(b)(1)(B) of the National Labor Relations Act and Union Discipline of Supervisor-Members after *Writers Guild:* Equipoise or Imbalance?, 1978 S. Ill. U. L. J. 453, 464 ("By intimating that section 8(b)(1)(B) is limited to protecting supervisors from discipline when they are specifically representing management in collective bargaining and the adjustment of grievances, the Court while not specifically overruling *Oakland Mailers*, seemed to be restricting the post-1968 extension of the section"); Comment, Section 8(b)(1)(B), National Labor Relations Act: When Does Union Discipline of Supervisor-Members Constitute Restraint or Coercion of the Selection of Employer Representatives?, 1976 Wis. L. Rev. 866, 882–883:

"The Court's use of the word 'engaged' implies that for a union to violate section 8(b)(1)(B) a supervisor must be disciplined for actually engaging in grievance adjustment, collective bargaining, or related activities. A mere

the Court's determination that the general impact of union discipline on a §8(b)(1)(B) representative's loyalty to the employer is insufficient to create a §8(b)(1)(B) violation. The Court recognized that a "likely effect" of union discipline of the employer representative for performing tasks other than grievance adjustment and collective bargaining would be "to make [the representative] subservient to the union's wishes when he performs those functions in the future." *Id.*, at 807. Nonetheless the Court refused to consider this potential problem of conflicting loyalties an adverse effect of union discipline because Congress did not design §8(b)(1)(B) to guarantee employers the undivided loyalty of §8(b)(1)(B) representatives.[6] Based on a review of the legislative history of §§2(3), 2(11), 14(a), and 8(b)(1)(B) of the Act,[7] the Court held:

---

theoretical connection to those duties—a potential fear of the union by the supervisor-member or the lack of undivided loyalty to the employer caused by the supervisor-member's honoring of the picket line—is too remote to cause a section 8(b)(1)(B) violation. In the Court's view it would appear that a violation of the section will occur only when the supervisor is disciplined while he or she is actually performing one of the protected activities."

[6] The Court stated:

"The concern expressed in this argument is a very real one, but the problem is one that Congress addressed, not through §8(b)(1)(B), but through a completely different legislative route. Specifically, Congress in 1947 amended the definition of 'employee' in §2(3), 29 U. S. C. §152(3), to exclude those denominated supervisors under §2(11), . . . thereby excluding them from coverage of the Act." *Florida Power*, 417 U. S., at 807.

[7] Section 2(3), 29 U. S. C. §152(3), provides in pertinent part:

"The term 'employee' shall include any employee, . . . but shall not include . . . any individual employed as a supervisor . . . ."

Section 2(11), 29 U. S. C. §152(11), which defines the term "supervisor," is set forth in n. 2, *supra.*

Section 14(a), 29 U. S. C. §164(a), reveals another part of the congressional resolution of the conflict-of-loyalty question:

"Nothing herein shall prohibit any individual employed as a supervisor from becoming or remaining a member of a labor organization, but no employer subject to this subchapter shall be compelled to deem individuals de-

> "Congress' solution [to the problem of conflicting loyalties] was essentially one of providing the employer with an option.  On the one hand, he is at liberty to demand absolute loyalty from his supervisory personnel by insisting, on pain of discharge, that they neither participate in, nor retain membership in, a labor organization.  Alternatively, an employer who wishes to do so can permit his supervisors to join or retain their membership in labor unions, resolving such conflicts as arise through the traditional procedures of collective bargaining.  But it is quite apparent, given the statutory language and the particular concerns that the legislative history shows motivated Congress to enact § 8(b)(1)(B), that it did not intend to make *that* provision any part of the solution to the generalized problem of supervisor-member conflict of loyalties."  *Id.*, at 812–813 (citation omitted; footnote omitted).

In addition, the Court stated that it was willing to assume that "the Board's *Oakland Mailers* decision fell within the outer limits" of the adverse-effect test.  *Id.*, at 805.  Thus, implicitly, the Board went beyond those limits "[i]n . . . subsequent cases . . . [where] the Board held that the same coercive effect was likely to arise from the disciplining of a supervisor whenever he was engaged in management or supervisory activities, even though his collective-bargaining or grievance-adjusting duties were not involved."  *Id.*, at 801–802.

Four years later, in *American Broadcasting Cos.* v. *Writers Guild, West, Inc.*, 437 U. S. 411 (1978) *(ABC)*, the Court applied the adverse-effect test enunciated in *Florida Power* and held that union discipline of employer representatives who performed § 8(b)(1)(B) duties, specifically grievance adjustment, during a strike violated the employer's rights under § 8(b)(1)(B):

---

fined herein as supervisors as employees for the purpose of any law, either national or local, relating to collective bargaining."

"[T]he Court in *[Florida Power]* delineated the boundaries of when that 'carryover' effect would violate § 8(b)(1)(B): whenever such discipline may adversely affect the supervisor's conduct *in his capacity as a grievance adjustor or collective bargainer.* In these situations — that is, when such impact might be felt — the employer would be deprived of the full services of his representatives and hence would be restrained and coerced in his selection of those representatives." 437 U. S., at 429 (emphasis added).

The Court also held that, before a § 8(b)(1)(B) violation can be sustained, the NLRB must make a factual finding that a union's sanction will adversely affect the employer representative's performance of collective-bargaining or grievance-adjusting duties. *Id.*, at 430.

In *ABC*, therefore, the Board found, and the Court agreed, that the union fines of employer representatives *engaged in* grievance adjustment would have an adverse effect on the supervisor-member's future performance of that same § 8(b)(1)(B) duty. This holding is consistent with the analysis of the Court in *Florida Power* — that § 8(b)(1)(B) forbids only discipline for acts or omissions that occur while an employer representative is engaged in § 8(b)(1)(B) activities.[8] Accord-

---

[8] It is also consistent with a plausible theory of human nature. An employer representative who has been disciplined for acts or omissions that occur while he or she is engaged in § 8(b)(1)(B) activity might well be wary about crossing the union when performing such duties in the future. But a supervisor-member who has been disciplined for behavior unrelated to § 8(b)(1)(B) functions is unlikely to react by altering his or her performance of § 8(b)(1)(B) tasks. Cf. Comment, Union Discipline of Supervisors Who are Union Members for Performing Rank-and-File Struck Work Is Not an Unfair Labor Practice, 87 Harv. L. Rev. 458, 468 (1973) ("[S]upervisors can easily distinguish discipline for performing rank-and-file struck work from discipline for the manner in which they represent the employer in [§ 8(b)(1)(B)] processes"). Insofar as dictum in *ABC* suggests that a union may not discipline supervisor-members for acts or omissions that occur while the supervisor-member is engaged in supervisory activities

ingly, we conclude that discipline of a supervisor member is prohibited under § 8(b)(1)(B) only when that member is engaged in § 8(b)(1)(B) activities—that is, collective bargaining, grievance adjustment, or some other closely related activity *(e. g.,* contract interpretation, as in *Oakland Mailers).*

One obvious ramification of this conclusion is that § 8(b)(1)(B) prohibits discipline of only those supervisor-members who actually perform § 8(b)(1)(B) duties. Clearly a supervisor cannot be disciplined for acts or omissions that occur during performance of § 8(b)(1)(B) duties if he or she has none. We therefore reject the NLRB's "reservoir doctrine," on which the Court of Appeals relied. As stated above, the rationale of the doctrine is that § 2(11) supervisors constitute a reservoir of workers available for selection at some future date as collective-bargaining agents or grievance adjusters. The Board speculates that if a union is permitted to discipline a supervisor-member, even one without § 8(b)(1)(B) duties, the union discipline *might* affect the supervisor's loyalty to his or her employer, the effect of that discipline *might* linger, a smaller pool of loyal supervisors *might* be available, and the employer *might* therefore be restricted in its *future* choice of representatives for § 8(b)(1)(B) purposes. The reservoir doctrine, and this chain of suppositions on which it rests, cannot be reconciled with the structure of the NLRA or with the Court's limited construction of § 8(b)(1)(B) in *Florida Power* and *ABC.*

The structure of the NLRA reveals that in § 8(b)(1)(B) Congress addressed "a separate and far more limited problem than that of conflict of loyalties." *Florida Power,* 417 U. S., at 811, n. 21. One need only compare the scope of § 8(b)(1)(B) with that of other sections of the Act: § 8(b)(1)(B) covers only individuals selected as the employer's representatives "for the purposes of collective bargaining or the adjustment of grievances," while the total class of supervisors

---

*other than* § 8(b)(1)(B) activities, the dictum is inconsistent with *Florida Power,* and we disavow it.

"is defined by § 2(11) to include individuals engaged in a substantially broader range of activities." 417 U. S., at 811, n. 21.

Second, the Board's justification for the "reservoir doctrine" is that it protects the supervisor's loyalty to the employer from the conflicting pressures of union discipline.[9] Yet union discipline of supervisors who engage in no § 8(b)(1)(B) activity coerces the employer only by creating the potential for interference with hypothetical grievance-adjustment or collective-bargaining duties; it cannot have a contemporaneous effect on the performance of § 8(b)(1)(B) duties themselves. This is precisely the vague conflict-of-loyalties concern the Court said could not support a § 8(b)(1)(B) charge against the union. *Florida Power, supra,* at 812–813.[10]

---

[9] See *NLRB* v. *Rochester Musicians Assn.,* 514 F. 2d 988, 992–993 (CA2 1975) ("The rationale of [the reservoir] doctrine is that supervisors are viewed as a reservoir of manpower available and likely to be chosen as collective bargainers or grievance adjusters at some later date. Since union discipline could affect the supervisor's loyalty to the employer, the employer would be restricted in his choice of future representatives"); *Erie Newspaper Guild* v. *NLRB,* 489 F. 2d 416, 420 (CA3 1973) ("The Board contends that once these supervisors were disciplined by the union, they could no longer be fully loyal to the employer who would be coerced in his future selection of representatives"); *International Assn. of Heat and Frost Insulators & Asbestos Workers (Cork Insulating Co.),* 189 N. L. R. B. 854 (1971) ("[T]he employer [has a] right . . . to select [collective-bargaining and grievance] representatives from an uncoerced group of supervisors whose loyalty to him has not been prejudiced"). See generally Comment, The Role of Supervisors in Employee Unions, 40 U. Chi. L. Rev. 185, 197 (1972).

[10] For this reason, one Court of Appeals concluded that the Court's decision in *Florida Power* signified the demise of the reservoir doctrine:

"There is surely no more interference with the actual process of grievance adjustment in union discipline of a supervisor who at present plays no part in that process, than there is in discipline of one with actual authority to adjust grievances for performing non-supervisory work. In each case the union's action is too insignificant to affect the management's rights pro-

Finally, the crux of the Court's holding in *ABC* was that the Board must make a factual inquiry whether a union's sanction may adversely affect the employer representative's performance of collective-bargaining or grievance-adjusting duties before a § 8(b)(1)(B) violation can be sustained. 437 U. S., at 430. One simply cannot discern whether discipline will have an adverse impact on a supervisor-member's future performance of § 8(b)(1)(B) duties when their existence is purely hypothetical.[11]

We conclude that the union discipline at issue was not an unfair labor practice. Although both Schoux and Choate were supervisors within the meaning of § 2(11), neither had grievance-adjustment or collective-bargaining responsibilities protected by § 8(b)(1)(B).[12] The possibility that a § 2(11)

tected by § 8(b)(1)(B)." *NLRB* v. *Rochester Musicians Assn., supra,* at 992–993.

See also Comment, 1978 S. Ill. U. L. J., at 475 ("The Board must find the supervisor-members actually are empowered with real collective bargaining or grievance adjusting functions"); Comment, Changing Interpretation of NLRA Section 8(b)(1)(B) — Union Discipline of Supervisors in the Aftermath of *Florida Power & Light,* 10 John Marshall J. Prac. & Proc. 117, 126 (1976) ("In short, the Court . . . abolished the 'reservoir doctrine'"); cf. *Erie Newspaper Guild* v. *NLRB, supra,* at 420 (disapproving "reservoir doctrine" before *Florida Power* was decided).

[11] See Comment, 87 Harv. L. Rev., at 467, n. 65:

"[I]n cases in which the disciplined union members are supervisors but not § 8(b)(1)(B) representatives, a finding of an unfair labor practice will be . . . difficult to justify, since a crucial factor is the impact the discipline will have on the members when they perform collective bargaining and grievance adjustment duties. Although the union discipline could arguably influence fellow supervisors who do perform such duties, or might influence the disciplined supervisors in the performance of any such duties they might be granted in the future, the likely impact on grievance adjustment and collective bargaining is clearly less significant."

[12] The NLRB held in the alternative that because Schoux did adjust *personal* grievances—as opposed to contract grievances—he qualified as a § 8(b)(1)(B) supervisor, even without application of the reservoir doctrine. As a consequence of our conclusion in Part III, *infra,* we need not decide whether the Board's broad definition of grievance—and hence of "griev-

supervisor might someday perform § 8(b)(1)(B) functions and that past discipline might then have an adverse effect on the performance of such duties is simply too speculative to support a finding that an employer has been "restrain[ed] or coerce[d]" "in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances."

## III

The Court of Appeals found, as a matter of law, that the Union did not have a collective-bargaining relationship with Royal or Nutter, and that it did not seek to represent their employees in the future. It held that such a finding precluded union liability for violation of § 8(b)(1)(B). The NLRB argues, however, that even under these circumstances, the Union's enforcement of its no-contract-no-work rule against its supervisor-members would restrain or coerce Royal and Nutter by affecting the way in which the supervisor-members performed their § 8(b)(1)(B) tasks and by restricting the selection of § 8(b)(1)(B) representatives. On reasoning analogous to that in Part II, we find that the absence of a collective-bargaining relationship between the union and the employer, like the absence of § 8(b)(1)(B) responsibilities in a disciplined supervisor-member, makes the possibility that the Union's discipline of Schoux and Choate will coerce Royal and Nutter too attenuated to form the basis of an unfair labor practice charge.

---

ance adjustment"—is consistent with the narrow purpose and scope of § 8(b)(1)(B). We observe, however, that in *Florida Power* the Court said that grievance adjustment is a "particular and explicitly stated activity." 417 U. S., at 803. See also D. Bok & J. Dunlop, Labor and the American Community 220 (1970) ("grievance" is a "disput[e] over the application of the contract"). Other sections of the Labor Management Relations Act, 1947, similarly suggest a narrow meaning. See §§ 203 and 204, 29 U. S. C. §§ 173, 174. See also Comment, 1976 Wis. L. Rev., at 879 ("In *Florida Power* the Supreme Court appears to have defined both [collective bargaining and grievance adjustment] very narrowly").

First, the discipline will not affect the manner in which employer representatives perform grievance-adjustment or collective-bargaining tasks. When a union has a collective-bargaining relationship with an employer, it may have an incentive to affect its supervisor-member's handling of grievance-adjustment and collective-bargaining chores. Moreover, union discipline of employer representatives for behavior that occurs during performance of § 8(b)(1)(B) duties might adversely affect the future performance of those duties. See *supra*, at 585–586. But when a union has no collective-bargaining relationship with an employer, and does not seek to establish one, both the incentive to affect a supervisor's performance *and* the possibility that an adverse effect will occur vanish. The union has nothing to gain by interference with the supervisor-member's loyalty during grievance adjustment or collective bargaining; nor can the employer representative reasonably expect that he or she will be subject to discipline for the *manner* in which those duties are performed in the future.[13] In other words, the assumption underpinning *Florida Power* and *ABC*—that an adverse effect can occur simply by virtue of the fact that an employer representative is disciplined for behavior that occurs during performance of § 8(b)(1)(B) tasks — is not applicable when the employer has no continuing relationship with the union.[14]

---

[13] Direct coercion of an employer's selection of a § 8(b)(1)(B) representative would always be a § 8(b)(1)(B) violation, whether or not the union has or seeks a bargaining relationship with an employer. This case does not present the question whether indirect coercion of an employer in its selection of a representative through a union's *selective* enforcement of a facially uniform rule would constitute a violation of § 8(b)(1)(B) without regard to whether the union has a bargaining relationship with the employer. The Court of Appeals has suggested that it might. See *NLRB* v. *International Brotherhood of Electrical Workers*, 714 F. 2d, at 872 ("The case may be different if there is evidence that the union's actual purpose in enforcing its bylaw was to interfere with the employer's selection").

[14] In *American Broadcasting Cos.* v. *Writers Guild, West, Inc.*, 437 U. S. 411 (1978) *(ABC)*, the Court found that discipline imposed on grievance-

Second, the Union's discipline of Schoux and Choate does not coerce Royal and Nutter in their *selection* of § 8(b)(1)(B) representatives. Section 8(b)(1)(B) was primarily intended to prevent a union engaged in a long-term relationship with an employer from dictating the latter's choice of representative or the form that representation would take (single-unit or multiemployer unit). See S. Rep. No. 105, 80th Cong., 1st Sess., p. 21 (1947). It was not intended to prevent enforcement of uniform union rules that may occasionally have the incidental effect of making a supervisory position less desirable.

The only sense in which employers (both those with and those without a collective-bargaining relationship with the union) may be coerced in their *selection* of § 8(b)(1)(B) representatives by the application of the no-contract-no-work rule to supervisor-members is that the employer may be left with a smaller pool of individuals from which it may choose its representatives. This is because some union members will be reluctant to serve as § 8(b)(1)(B) representatives if the price is loss of union membership or payment of disciplinary fines.[15]

---

handling supervisors who crossed union picket lines violated § 8(b)(1)(B), even though the supervisor-members did not adjust grievances for the striking employees, but only for employees whom the striking union did not represent or desire to represent. *Id.*, at 437–438, n. 37. In that case, however, the union *did* represent some of the employer's employees and therefore had a bargaining relationship with the coerced employer. The union had a continuing relationship with the employer and an incentive (possibly recurrent) to affect the employer representative's performance of § 8(b)(1)(B) duties. In *ABC*, for example, the union needed the support of all employees to make the strike seeking benefits for its members effective.

[15] *ABC* does suggest in dictum that any discipline that affects a supervisor-member's "willingness to serve" as a § 8(b)(1)(B) supervisor is unlawful. *Id.*, at 436. The Court observed that the intended effect of the union's discipline was to deprive the employer of the services of its chosen representative for grievance adjustment for the duration of the strike and any strike in the future, *id.*, at 435, and concluded:

"Union pressure on supervisors can affect either their willingness to serve as grievance adjusters or collective bargainers, or the manner in which

For example, the no-contract-no-work rule is designed to prevent *any* union member from working for an employer that does not pay the union wage scale, but it does have the peripheral effect of making a § 8(b)(1)(B) representative less willing to serve in that capacity than he or she otherwise would be, see *ABC*, 437 U. S., at 436, thereby limiting the employer's selection. *Any* discipline imposed on a § 8(b)(1)(B) representative, however, will affect willingness to serve in this sense.[16]

they fulfill these functions; and either effect impermissibly coerces the employer in his choice of representative." *Id.*, at 436.

This statement was unnecessary to the disposition of *ABC*. There the Court held that the union fines had adversely affected the manner in which the employer representatives *fulfilled § 8(b)(1)(B) functions* and therefore interfered with the employer's control over its representatives.

[16] Cf. *Scofield* v. *NLRB*, 394 U. S. 423 (1969). *Scofield* involved § 8(b) (1)(A) of the NLRA which forbids a union "to restrain or coerce" employees in the exercise of their rights to refrain from collective activity and which contains a proviso stating that the section "shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein." The Court upheld union fines of members who had broken a union rule by refraining from certain collective activity, concluding that such discipline did not restrain or coerce the union members and hence did not violate § 8(b)(1)(A), saying:

"[Section] 8(b)(1) leaves a union free to enforce a properly adopted rule which reflects a legitimate union interest, impairs no policy Congress has imbedded in the labor laws, and is reasonably enforced against union members who are free to leave the union and escape the rule." 394 U. S., at 430.

Section 8(b)(1)(B) must be similarly interpreted to allow unions to enforce internal union rules that impair no labor policy. See Gould, Some Limitations Upon Union Discipline Under the National Labor Relations Act: The Radiations of *Allis-Chalmers*, 1970 Duke L. J. 1067, 1128–1129 ("If, as the Court said in *Allis-Chalmers*, the union has a substantial interest in disciplining strikebreakers, that analysis ought not to be altered simply because they happen to be in the supervisory positions. The thrust against the union as an institution and against its strike function is just as direct and effective").

In addition, so long as there is any attraction to union membership, this test would preclude existence of union rules excluding supervisors from membership. Again, this is because any union member who valued membership would be less willing to serve, see *ABC, supra,* at 436, if the cost of service were loss of membership, and because any reluctance to give up membership would limit the size of the supervisor pool from which an employer could select its representatives.[17] This minimal effect on an employer's selection of § 8(b)(1)(B) representatives is insufficient to support a § 8(b)(1)(B) charge. It is inconceivable that every union rule that affects a union member's willingness to serve as a supervisor could be prohibited by a provision as narrow in scope as § 8(b)(1)(B).

A supervisor-member cannot serve both masters without incurring some obligations to both; it is simply unfair to require unions to accept members who receive all of the benefits of the association and bear none of the obligations.[18] We

---

[17] It is highly unlikely that Congress intended § 8(b)(1)(B) to ban a union rule forbidding its members to be supervisors without saying so. It is undisputed that at the time § 8(b)(1)(B) was enacted, many unions allowed only rank-and-file workers to retain membership. See Brief for Respondent 11, n. 8.

In 1947 the NLRA was amended so that employers could prohibit supervisors from obtaining or maintaining union membership, see 29 U. S. C. §§ 152(3), 164(a), because Congress believed that granting supervisors a protected right to join a union is "inconsistent with the policy of Congress to assure workers freedom from domination or control by their supervisors" and "inconsistent with our policy to protect the rights of employers." H. R. Rep. No. 245, 80th Cong., 1st Sess., 14 (1947). Yet the NLRB's interpretation of § 8(b)(1)(B) would have the anomalous result of *requiring* unions to remain open to workers who decide to become supervisors.

[18] Cf. *Florida Power,* 417 U. S., at 812, n. 22 ("[W]hile both the employer and the union may have conflicting but nonetheless legitimate expectations of loyalty from supervisor-members during a strike, the fact that the supervisor will in some measure be the beneficiary of any advantages secured by the union through the strike makes it inherently inequita-

therefore reject the argument that unions must both accept supervisor-members and grant them immunity from enforcement of uniform rules.

Finally, both the structure of the NLRA and recent developments in its interpretation suggest that employers are no longer restrained or coerced in their selection of representatives by union discipline of supervisor-members. The statute itself reveals that it is the employer, not the supervisor-member, who is protected from coercion by the statutory scheme. It is difficult to maintain that an *employer* is restrained or coerced because a *union member* must accept union expulsion or other discipline to continue in a supervisory position. The employer's problem—that the supervisor-member might decline to serve as a representative or align with the union during a strike and deprive the employer of services—is of its own making. A dissenting member of the Board has said:

> "Having been afforded the opportunity to refuse to hire union members as supervisors, the opportunity to discharge supervisors for involvement in union affairs, the opportunity to incorporate into a collective-bargaining agreement the permissible extent of a supervisor-member's functioning during a strike and, indeed, the opportunity to provide additional incentives making it worthwhile for all union members to forfeit union benefits upon taking supervisory positions, the employer, having forsaken such opportunities, cannot now be heard to argue that the union is affecting its selection of the very grievance adjustment or collective bargaining representative it permits to retain union membership." *New York Typographical Union No. 6 (Triangle Publications),* 216 N. L. R. B. 896, 901 (1975) (member Fanning, dissenting).

---

ble that he be allowed to function as a strikebreaker without incurring union sanctions").

In *ABC* the Court determined that the employer was co-erced despite the fact that it could order the supervisor-members to leave the union and free themselves from further threats of discipline. But, as the Court pointed out, when *ABC* was decided, supervisor-members were *not* free to leave the union at any time. In *ABC*, for example, the union had a "known policy not to permit a member to resign during a strike and for a period of six months thereafter," so plainly "the employer's only recourse would have been to replace [the supervisor-members] as his grievance representatives." 437 U. S., at 436–437.

The law has since changed. Recently this Court decided in *Pattern Makers* v. *NLRB*, 473 U. S. 95 (1985), that union members have a right to resign from a union *at any time* and avoid imposition of union discipline. The employer may order its representatives to leave the union immediately and there is no barrier to a supervisor-member's obedience to that order. The very least that may be derived from *Pattern Makers* is that union rules or discipline that merely diminish an employer representative's willingness to serve no longer restrain or coerce the *employer* in its selection of a § 8(b)(1)(B) representative.

## IV

Section 8(b)(1)(B) was enacted to protect the integrity of the processes of grievance adjustment and collective bargaining—two private dispute-resolution systems on which the national labor laws place a high premium. Although some union discipline might impermissibly affect the manner in which a supervisor-member carries out § 8(b)(1)(B) tasks or coerce the employer in its selection of a § 8(b)(1)(B) representative, union discipline directed at supervisor-members without § 8(b)(1)(B) duties, working for employers with whom the union neither has nor seeks a collective-bargaining relationship, cannot and does not adversely affect the performance of § 8(b)(1)(B) duties. Consequently, such union

action does not coerce the employer in its selection of § 8(b)(1)(B) representatives. The order of the Court of Appeals for the Ninth Circuit is therefore

*Affirmed.*

JUSTICE SCALIA, concurring in the judgment.

Because I agree with the conclusion of Part III of the Court's opinion, I find it unnecessary (as should the Court) to reach the "reservoir doctrine" question discussed in Part II. And while I agree with much of the reasoning of Part III, I cannot join it, principally because in my view it does not matter whether the Union intended to represent Royal or Nutter; and if it did matter, I would find inadequate basis for overturning the Board's factual finding of representational intent. I would affirm the Court of Appeals solely on the ground that the Union had no collective-bargaining agreement covering either Royal or Nutter.

Section 8(b)(1)(B) of the National Labor Relations Act makes it unlawful for a labor union "to restrain or coerce . . . an employer in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances." 29 U. S. C. § 158(b)(1)(B). As the Court suggests, the statute by its plain terms governs only the relationship between unions and employers, not the relationship between unions and their members. Further, it pertains to only one aspect of the union-employer relationship: the employer's *selection* of a bargaining or grievance adjustment representative. Nonetheless, in *American Broadcasting Cos.* v. *Writers Guild, Inc.*, 437 U. S. 411 (1978) *(ABC)*, we affirmed the Board's application of this statute to union discipline of members who cross picket lines in order to perform grievance adjustment work for employers with whom the union has a collective-bargaining contract. The Board now asks us to approve an extension of the statute to a still more remote form of such "restraint" by a union upon employer "selec-

tion"—namely, such restraint directed against an employer with whom the union has no collective-bargaining agreement.

If the question before us were whether, given the deference we owe to agency determinations, the Board's construction of this Court's opinion in *ABC* is a reasonable one, I would agree with the Government that it is. We defer to agencies, however (and thus apply a mere "reasonableness" standard of review) in their construction of their statutes, not of our opinions. The question before us is not whether *ABC* can reasonably be read to support the Board's decision, but whether § 8(b)(1)(B) can reasonably be read to support it. It seems to me that *ABC* and the Board's prior decision in *San Francisco-Oakland Mailers' Union No. 18 (Northwest Publications, Inc.)*, 172 N. L. R. B. 2173 (1968), which held that unions violate § 8(b)(1)(B) by disciplining member-representatives for the manner in which they interpret collective-bargaining contracts, represent at best the "outer limits," *Florida Power & Light Co.* v. *Electrical Workers*, 417 U. S. 790, 805 (1974), of any permissible construction of § 8(b)(1)(B). I would certainly go no further, and would accordingly limit the Board's indirect restraint theory to circumstances in which there is an actual contract between the union and affected employer, without regard to whether the union has an intent to establish such a contract. Of course, as the Court's opinion points out: "Direct coercion [*i. e.*, real coercion] of an employer's selection of a § 8(b)(1)(B) representative would always be a § 8(b)(1)(B) violation, whether or not the union has or seeks a bargaining relationship with an employer." *Ante*, at 590, n. 13.

The Board's approach is the product of a familiar phenomenon. Once having succeeded, by benefit of excessive judicial deference, in expanding the scope of a statute beyond a reasonable interpretation of its language, the emboldened agency presses the rationale of that expansion to the limits of its logic. And the Court, having already sanctioned a point

of departure that is genuinely not to be found within the language of the statute, finds itself cut off from that authoritative source of the law, and ends up construing not the statute but its own construction. Applied to an erroneous point of departure, the logical reasoning that is ordinarily the mechanism of judicial adherence to the rule of law perversely carries the Court further and further from the meaning of the statute. Some distance down that path, however, there comes a point at which a later incremental step, again rational in itself, leads to a result so far removed from the statute that obedience to text must overcome fidelity to logic. Chief Justice Burger's remarks in *United States* v. *12 200-ft. Reels of Film*, 413 U. S. 123 (1973), are nowhere more applicable than in this context:

> "The seductive plausibility of single steps in a chain of evolutionary development of a legal rule is often not perceived until a third, fourth, or fifth 'logical' extension occurs. Each step, when taken, appeared a reasonable step in relation to that which preceded it, although the aggregate or end result is one that would never have been seriously considered in the first instance. This kind of gestative propensity calls for the 'line drawing' familiar in the judicial, as in the legislative process: 'thus far but not beyond.'" *Id.*, at 127.

That is the case here. Logic is on the side of the Board, but the statute is with the respondent. I concur in the judgment of the Court.

JUSTICE WHITE, with whom THE CHIEF JUSTICE and JUSTICE O'CONNOR join, dissenting.

The majority has once again substituted its judgment for a fair and reasonable interpretation by the National Labor Relations Board of § 8(b)(1)(B), and I, once again, respectfully dissent. See *Florida Power & Light Co.* v. *Electrical Workers*, 417 U. S. 790, 813 (1974) (WHITE, J., dissenting).

The Board concluded that a union violates § 8(b)(1)(B) when it disciplines a member, who serves as an employer representative,[1] for working for an employer which does not have a collective-bargaining agreement with the union. The purpose of such discipline is to force the member to leave his or her job and its effect is to deprive the employer of the services of the representative which it has selected. *International Brotherhood of Electrical Workers Local 340 (Royal Electric Co.)*, 271 N. L. R. B. 995, 1000 (1984). The Board's interpretation of § 8(b)(1)(B) is longstanding. *New Mexico District Council of Carpenters and Joiners of America (A. S. Horner, Inc.)*, 177 N. L. R. B. 500 (1969), enf'd, 454 F. 2d 1116 (CA10 1972).

As we have often stated, "[t]he function of striking [the] balance to effectuate national labor policy is often a difficult and delicate responsibility, which the Congress committed primarily to the National Labor Relations Board, subject to limited judicial review." *American Broadcasting Cos.* v. *Writers Guild, West, Inc.*, 437 U. S. 411, 431 (1978) *(ABC)* (internal quotations omitted). We do not sit as a "super-Board authorized to overrule an agency's choice between reasonable constructions of the controlling statute. We should not impose

---

[1] In Part II, the majority holds that Schoux and Choate were not "representatives" of their employers within the meaning of § 8(b)(1)(B). This issue is not properly before this Court. The Board concluded that Schoux and Choate acted as grievance-adjustment or collective-bargaining representatives for their employers under § 8(b)(1)(B) and the Ninth Circuit agreed with the Board's conclusion. *Ante,* at 577, 578–579. The Board obviously did not raise this issue in its petition for certiorari since it had prevailed on the issue. The only question presented for our review was "[w]hether the National Labor Relations Board reasonably concluded that a union violated Section 8(b)(1)(B) of the National Labor Relations Act by disciplining supervisor-members (who represent management in grievance adjustment or collective bargaining) for working for an employer that does not have a collective bargaining agreement with that union." Respondent did not cross-petition for certiorari nor did it challenge the Court of Appeals' conclusion in its brief in opposition to the petition for writ of certiorari or in its brief on the merits. We should therefore judge the case as it comes to us.

our views on the Board as long as it stays within the outer boundaries of the statute it is charged with administering." *Florida Power, supra,* at 816. The Board has done so here. By its plain language, §8(b)(1)(B) protects an employer's right to *select* grievance-adjustment and collective-bargaining representatives, and does not merely ensure that union control does not affect the manner in which a selected representative thereafter performs his or her duties. And I see nothing in the language or legislative history of the NLRA which indicates congressional intent to foreclose the Board from applying § 8(b)(1)(B) to the type of union interference with an employer's right to select its representatives which is presented here. The section was primarily intended to prevent unions from forcing employers into multi-employer bargaining units and from dictating the identity of employers' representatives for collective bargaining and grievance adjusting. *NLRB* v. *Amax Coal Co.,* 453 U. S. 322, 334–335 (1981); *Florida Power, supra,* at 803–804. There is no reason why the Board cannot fairly interpret the interdiction against dictating an employer's choice of representative to encompass both requiring an employer to select Mr. Y, see *Florida Power, supra,* and preventing an employer from selecting anyone who is a member of a union which does not have a collective-bargaining agreement with the employer.[2]

Moreover, we traveled this road previously in *ABC.* We stated there: "Union pressure on supervisors can affect either *their willingness to serve as grievance adjustors or collective bargainers,* or the manner in which they fulfill these functions; and either effect impermissibly coerces the

---

[2] The Senate Report stated that "this subsection would not permit a union to dictate who shall represent an employer in the settlement of employee grievances, or to *compel the removal of a personnel director or supervisor* who has been delegated the function of settling grievances." S. Rep. No. 105, 80th Cong., 1st Sess., pt. 1, p. 21 (1947) (emphasis added).

employer in his choice of representative." 437 U. S., at 436 (emphasis added). The majority mischaracterizes this statement as "dictum," "unnecessary to the disposition of *ABC*." *Ante*, at 591–592, n. 15. The union discipline threatened in that case was found to have kept some supervisor-members from reporting to work during the strike and to have adversely affected those who reported to work in the performance of their grievance-adjustment duties. 437 U. S., at 431–436. As to the former group, we agreed with the Board that ABC was "restrained and coerced within the meaning of § 8(b)(1)(B) by being totally deprived of the opportunity to choose these particular supervisors as [its] collective-bargaining or grievance-adjustment representatives during the strike." *Id.*, at 432. The *manner* in which these supervisor-members performed their duties was obviously not affected since they performed no duties during the strike; as here, it was their willingness to serve as employer representatives that was at issue. We cited approvingly the Board's disposition of an unfair labor practice claim analogous to the claim asserted in *ABC* and virtually identical to the one asserted here. In *A. S. Horner, Inc.*, *supra*, the Board held that union discipline imposed on a member who worked as a supervisor for an employer which had no contract with the union violated § 8(b)(1)(B) because it would have required the supervisor to leave his job and thus would have deprived the employer of the services of its selected representative. 437 U. S., at 436, n. 36.

Also at issue in *ABC* was a group of employees — directors — who were members of the striking union but who performed grievance-adjustment duties only with respect to members of other unions. That fact did not lead us to a different analysis or result under § 8(b)(1)(B). "A union may no more interfere with the employer's choice of a grievance representative with respect to employees represented by other unions than with respect to those employees whom it itself represents. *International Organization of Masters, Mates*

and Pilots, *International Marine Division,* 197 N. L. R. B. 400 (1972), enf'd, 159 U. S. App. D. C. 11, 14, 486 F. 2d 1271, 1274 (1973), cert. denied, 416 U. S. 956 (1974), and *International Organization of Masters, Mates and Pilots* v. *NLRB,* 539 F. 2d 554, 559–560 (CA5 1976)." *Id.,* at 438, n. 37. The majority seeks to distinguish *ABC* on the ground that respondent here has no collective-bargaining relationship at all with Royal and Nutter, *ante,* at 590–591, n. 14, but this fact is without significance. The harm is the same in both cases —the union discipline would deprive the employer of the services of its selected representative.[3]

The majority further attempts to distance itself from *ABC* by asserting that *Pattern Makers* v. *NLRB,* 473 U. S. 95 (1985), in which we held that union members have a right to resign from a union during a strike or when a strike is imminent and avoid imposition of union discipline, undercuts the force of *ABC.* *Ante,* at 594–595. But *Pattern Makers* does not significantly affect the rationale of *ABC.* Although ABC at the time could not have required its supervisor-members to renounce union membership when it received notice that the union was calling a strike, it could have required them to renounce their union membership when they were first promoted to a supervisory position. 437 U. S., at 436–437. Nevertheless, the Board concluded that this employer option did not render § 8(b)(1)(B) inapplicable and we accepted that decision. *Id.,* at 437. Clearly, the position of a supervisor-member creates some tension in the administration of labor relations. Both unions and employers have the power to resolve the tension, however. Unions can expel members who

---

[3] Section 8(b)(1)(B) is not on its face limited to coercion by a union with a collective-bargaining relationship with an employer. In contrast, § 8(b)(3), 29 U. S. C. § 158(b)(3), for example, makes it an unfair labor practice for a union to refuse to bargain collectively with an employer, "provided it is the representative of his employees."

serve as supervisors[4] and employers can forbid supervisors to retain their union membership. Unions and employers do not always do so, however, obviously because each believes that there is some benefit to be gained from accepting supervisor-members. The Board has interpreted § 8(b)(1)(B) to require unions that choose to accept the benefits of supervisor-members to bear the burden of their immunity from certain disciplinary rules, in furtherance of the federal policy that employers should select their representatives free of union coercion. The majority simply disagrees with this judgment by the Board and would place the burden on employers; that is, if an employer chooses to accept the benefits of supervisor-members, it must bear the risk that it may be deprived of their services as representatives for collective bargaining and grievance adjustment. But this choice between reasonable constructions of the statute has been entrusted to the NLRB, not to this Court. Hence, I dissent.

---

[4] The majority asserts that the Board's construction of § 8(b)(1)(B) requires that it also interpret the section to prohibit a union from excluding supervisors from membership, since such a union rule would similarly make members less willing to serve in supervisory positions. *Ante*, at 593–594. The Board has not, however, interpreted § 8(b)(1)(B) so broadly. In *National Association of Letter Carriers*, 240 N. L. R. B. 519 (1979), the Board held that it was no violation of § 8(b)(1)(B) for a union to adopt a rule rendering letter carriers who accepted positions as temporary supervisors ineligible for membership as long as they worked in that capacity, despite the fact that the rule diminished the pool of letter carriers available to serve as temporary supervisors. I see no fatal inconsistency in the Board's positions. In the case of a union rule which excludes all supervisors from membership regardless of their employers, the primary relationship affected is the one between the union and its members, whereas in the case of a union rule prohibiting members from working for particular employers (those without collective-bargaining agreements with the union), the primary relationship affected is the one between the union and the employers. A union more easily infringes upon a "policy Congress has imbedded in the labor laws," *ante*, at 592, n. 16, in the latter situation.