955 F.2d 212
 139 L.R.R.M. (BNA) 2487, 60 USLW 2575,
120 Lab.Cas. P 11,091
 MARITIME OVERSEAS CORPORATION, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD; International Organization
of Masters, Mates and Pilots, AFL-CIO, Respondents.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
INTERNATIONAL ORGANIZATION OF MASTERS, MATES AND PILOTS,
AFL-CIO, Respondent.
INTERNATIONAL ORGANIZATION OF MASTERS, MATES AND PILOTS,
AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD; Keystone Shipping Company;
Moore McCormack Bulk Transport, Incorporated, Respondents,
and
Marine Transport Lines, Inc., Defendant.
KEYSTONE SHIPPING COMPANY; Moore McCormack Bulk Transport,
Incorporated, Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
 Nos. 91-1030, 91-1055, 91-1716 and 91-1726.
 United States Court of Appeals,
Fourth Circuit.
 Argued Oct. 29, 1991.
Decided Jan. 28, 1992.
 
 Seymour M. Waldman, argued (Patricia McConnell, on brief), Vladeck, Waldman, Elias & Engelhard, P.C., New York City, for petitioner IOMM & P.
 Betinna Barasch Plevan, argued (Joseph Baumgarten and Joseph Lee Matalon, on brief), Proskauer, Rose, Goetz & Mendelsohn, New York City, for petitioners Keystone and Moore McCormack.
 Andrew Ernest Zelman, argued (Jeffrey M. Schlossberg, on brief), Seham, Klein & Zelman, New York City, for petitioner Maritime Overseas.
 David Arthur Fleischer, Sr. Atty. argued (Jerry M. Hunter, Gen. Counsel, D. Randall Frye, Acting Deputy Gen. Counsel, Aileen A. Armstrong, Deputy Associate Gen. Counsel, and Howard E. Perlstein, on brief), N.L.R.B., Washington, D.C., for respondent.
 Before WILKINSON and NIEMEYER, Circuit Judges, and YOUNG, Senior District Judge for the District of Maryland, sitting by designation.
 OPINION
 WILKINSON, Circuit Judge:
 
 
 1
 At issue in this case is the scope of the protections afforded employers by § 8(b)(1)(B) of the National Labor Relations Act. That section makes it an unfair labor practice for unions to restrain or coerce employers in their selection of collective bargaining representatives and grievance adjusters. The appeal before us stems from charges of § 8(b)(1)(B) violations brought by four maritime shipping companies against the International Organization of Masters, Mates and Pilots, AFL-CIO (MMP), the union that formerly represented those companies' licensed deck officers. The companies assert that these licensed deck officers were grievance adjusters. The alleged § 8(b)(1)(B) violations took the form of union striking, picketing, and disciplinary actions that sought, inter alia, to coerce the companies into retaining or reinstating only MMP members as licensed deck officers. The National Labor Relations Board held that the union actions were § 8(b)(1)(B) violations as they applied to some of the licensed deck officers but not others. Additionally, the Board held that discipline directed by the union against non-grievance adjusters could not violate the section.
 
 
 2
 The underlying question is whether § 8(b)(1)(B) of the Act permits MMP to coerce the companies into lodging the resolution of disputes aboard their ships solely in MMP members. We do not believe it does. While we thus affirm the Board's finding that there was an unlawful objective to the strike and picketing that violated § 8(b)(1)(B), we believe that the Board applied this finding too narrowly. We reverse the Board's ruling that certain of the licensed deck officers were not grievance adjusters, and in so doing, we reject the notion that an employee must rigidly adhere to some prescribed formal procedure in order for dispute resolution to qualify as § 8(b)(1)(B) grievance adjustment. We also reverse the Board's holding that only some of the disciplinary actions in this case violated the Act, and instead hold that all disciplinary measures in furtherance of a strike with a plainly unlawful objective ran afoul of the statute. Though we enforce the Board's order in part, the case is hereby remanded to the Board to modify its order in accordance with this decision.
 
 I.
 
 3
 Keystone Shipping Company (Keystone), Marine Transport Lines (MTL), Maritime Overseas Corporation (MOC), and Moore McCormack Bulk Transport (Mormac) operate ocean-going tanker vessels engaged in interstate and international trade. On each of their ships, the companies employ licensed deck officers (LDOs) as supervisory personnel. The complement of LDOs on a ship often includes masters, chief mates, second mates, and third mates. Permanent second and third mates often fill in temporarily for vacationing masters and chief mates, and it is common practice for the companies to promote their second and third mates to the jobs of master and chief mate when a permanent position becomes available.
 
 
 4
 The companies' LDOs had been represented in collective bargaining negotiations for a number of years by MMP.[1] Each of the companies was party to a 1981 collective bargaining agreement with MMP concerning the LDOs that was due to expire on June 15, 1984. That agreement recognized MMP as the exclusive bargaining representative for LDOs, required that all LDOs be hired from MMP hiring halls, and required that all LDOs be union members.
 
 
 5
 With respect to the companies in this case, the only workers represented by MMP were LDOs. The companies' unlicensed personnel were represented either by the National Maritime Union (NMU) or the Seafarers Union (SIU), and grievance procedures were outlined in the contracts with both unions. The LDOs, as will be explained below, were the individuals who adjusted grievances brought by or on behalf of members of NMU or SIU.
 
 
 6
 In 1984, the companies broke off their bargaining relationships with MMP. MTL notified its LDOs on June 15, 1984, that it would no longer recognize MMP as the LDOs' collective bargaining representative. MTL, however, offered continued employment to all its LDOs at reduced wage and benefit levels, indicating that its action was taken in response to depressed conditions in the shipping industry. Eight of the LDOs immediately refused this offer, and by October 3, 1984, MTL had replaced approximately forty of the seventy-three LDOs who had been working for it on June 15. None of these replacements came from the MMP hiring hall.
 
 
 7
 The other three companies initially agreed to a revocable interim contract extension with MMP while negotiations over a new agreement continued. That interim contract was terminated, however, on September 27, 1984, by Keystone; on October 1 by Mormac; and on October 2 by MOC. Like MTL, each of the three companies announced that it would no longer recognize MMP as the bargaining representative for the LDOs due to competitive pressures, and the three companies offered their LDOs continued employment at reduced wage and benefit levels. Nearly all of the LDOs who worked for these three companies accepted the offers.
 
 
 8
 MMP responded to these developments in three different ways. First, on October 3, 1984, MMP initiated a strike against the companies. The union ordered its members to cease all work for the four companies that was not necessary to insure the security of a ship. Anticipating that many striking LDOs would be discharged by the companies, MMP also ordered members to refuse to leave the companies' ships voluntarily until confronted by law enforcement officers or other government officials. The strike was not limited to MMP members who served as LDOs for the companies, but also extended to other MMP members who had any association with the companies, such as pilots who worked as independent contractors. In response to the strike, the companies fired the LDOs who refused to work and attempted to hire replacements to assume their duties. Despite the hiring of replacements, the companies still suffered substantial, costly delays as a result of widespread adherence by MMP members to the union's order not to leave a ship until arrest was imminent.
 
 
 9
 As the effectiveness of the strike waned in mid-October due to the firing of the striking LDOs, the union initiated the second prong of its response, which involved picketing the companies' ships both on land and with picket boats. All MMP members were required to register for picket duty in order to receive any future job referrals. While many of the picket signs alleged only that the companies were paying substandard wages and benefits, others went well beyond this to accuse the companies of engaging in union busting and to demand restoration of MMP job rights. On several occasions, the interaction between the picketers and those union members who remained on the job became quite tense, even resulting in threats of bodily injury and death made by picketers against some LDOs who refused to honor the strike.
 
 
 10
 The final element of the union's response involved disciplinary actions brought against MMP members who refused to obey the strike or picketing orders. From the earliest stages of the strike, MMP demanded that the names of non-complying members be reported to headquarters, and threats of disciplinary action were made against such members. Approximately one hundred LDOs, management personnel, and pilots were fined by the union, with several fines exceeding $20,000. Some of the fines were issued after a complete hearing held by a union trial committee, but others were levied unilaterally by strike committees without providing the accused party with the hearing contemplated by MMP rules.
 
 
 11
 In response to these actions, each of the companies filed charges against MMP with the National Labor Relations Board (NLRB) alleging that the union's activities constituted unfair labor practices under § 8(b)(1)(B) of the National Labor Relations Act, 29 U.S.C. § 158(b)(1)(B). That provision prohibits a labor organization from restraining or coercing "an employer in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances." Id. Prior to the hearing on these charges conducted by the Administrative Law Judge (ALJ), the United States District Court for the District of Maryland entered on January 15, 1985, a consent injunction pursuant to 29 U.S.C. § 160(j) enjoining MMP from continuing the activities at issue before the NLRB.
 
 
 12
 Following issuance of the ALJ's consolidated opinion for the cases on March 21, 1986, MMP, MTL, and MOC filed exceptions to the ALJ's decision with the NLRB. The NLRB issued its opinion on January 31, 1991. The Board affirmed the ALJ's holding that the strike and picketing vis-a-vis the masters and chief mates had violated § 8(b)(1)(B). This conclusion stemmed from the finding that the union's strike and picketing had as one of its objectives the replacement of non-MMP LDOs with MMP members. The Board declined to reach the question of whether the other objectives for MMP's actions--to gain recognition, to achieve a collective bargaining agreement, and to gain adherence to area labor standards--violated § 8(b)(1)(B).
 
 
 13
 Over the dissent of Chairman Stephens, the Board reversed the ALJ's finding that second and third mates were grievance adjusters. Thus, the Board did not consider the strike and picketing as it related to second and third mates to have violated the statute. On the issue of fines, the NLRB upheld the ALJ's ruling that the disciplinary actions taken against masters and chief mates violated § 8(b)(1)(B). Because the Board did not deem second and third mates to be grievance adjusters, it reversed the ALJ's conclusion that the fines against those individuals ran afoul of the statute. Similarly, the NLRB reversed the ALJ's finding that fines against other persons who were not § 8(b)(1)(B) representatives, most notably pilots, were illegal.
 
 
 14
 Both the union and all the companies except MTL have appealed different aspects of the NLRB's ruling to this court.
 
 II.
 
 15
 Section 8(b)(1)(B) is one of the chief means utilized by Congress to promote private dispute resolution between unions and employers. Congress stated its preference for private grievance adjustment in the Labor Management Relations Act: "Final adjustment by a method agreed upon by the parties is declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective-bargaining agreement." 29 U.S.C. § 173(d). This preference is not surprising. The use of a grievance procedure affords management "a valuable channel of communication" with both the union and the employees, and it promotes communication and understanding between union leaders and their membership. Derek C. Bok & John T. Dunlop, Labor and the American Community 79 (1970). Private grievance adjustment also avoids the expenditure of scarce judicial resources in the resolution of disputes and provides to the parties a less expensive, speedier procedure conducted according to rules that they have developed for themselves.
 
 
 16
 Given these benefits, Congress has made it an unfair labor practice for a union to restrain or coerce an employer in the selection of its grievance adjusters. 29 U.S.C. § 158(b)(1)(B). Similarly, the courts and the Board have interpreted other provisions of the statute to prevent employers from intimidating employees in the presentation of grievances. See, e.g., Republic Die & Tool Co. v. NLRB, 680 F.2d 463, 465 (6th Cir.1982); Caterpillar Tractor Co. v. NLRB, 638 F.2d 140, 141 (9th Cir.1981); Vanport Sand & Gravel, Inc., 270 NLRB 1358, 1361 (1984). To allow coercion by either side would create a disincentive for employers and unions to agree to take part in private grievance adjustment. For example, if an employer could be coerced in its selection of its grievance adjuster, "the employer's preferred interpretation of the contract could be effectively thwarted by a jobsite representative who 'resolved' grievances simply by agreeing to whatever the union's job steward proposed." Sheet Metal Workers Int'l Ass'n, Local 68, 298 NLRB No. 152, slip op. at 12 (1990). The climate of fairness that is required for an effective grievance procedure can hardly be fostered if one side is unwilling to accept the other's chosen representatives.
 
 
 17
 Though effective functioning of the grievance process envisioned by Congress is important in any employment context, the utility of grievance procedures in a contract covering employees who must live and work in harsh shipboard conditions for extended periods of time is particularly great. Indeed, to avoid escalation of otherwise mundane disputes into major shipboard problems, the NMU contract not only includes extremely detailed provisions as to living and working conditions, but also allows "[a]ny employee who feels that he has been unjustly treated" in connection with the contract to bring a grievance. Similarly, the grievance procedure outlined in the SIU contract authorizes presentation of grievances concerning "any matter which may require adjustment or improvement." In agreeing to these broadranging grievance procedures, the companies adopted the method of dispute resolution expressly preferred by Congress, and the companies are entitled to the uncoerced selection of their grievance adjusters, which is guaranteed them by § 8(b)(1)(B) of the Act.
 
 III.
 
 18
 Both sides agree that two classes of LDOs--the masters and chief mates--are bona fide grievance adjusters for purposes of § 8(b)(1)(B). Thus, if one objective of the strike and picketing activity was to coerce management to retain or to reinstate MMP members in these jobs, such activity plainly would run afoul of the Act. MMP contends, however, that the NLRB erred in finding that one objective of its strike against the companies was the replacement of non-MMP LDOs with MMP members. In its opinion, the Board indicated that this replacement objective actually involved two prongs, either of which would have been unlawful: the union sought to restore job rights to MMP members whom the companies had replaced with nonMMP LDOs and it also sought to prevent the companies from discharging MMP LDOs then employed and replacing them with nonMMP members.
 
 
 19
 We must uphold factual findings made by the Board if they are "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e), (f). After reviewing the record, we find substantial evidence to support the finding that an unlawful replacement objective animated the union activity at issue. We shall not attempt to duplicate the efforts of the ALJ in setting forth the evidence. Rather, we note only the evidence that most persuasively supports the Board's finding.
 
 A.
 
 20
 MMP initiated its strike against the companies on October 3, 1984, and the correspondence from union officials to its members regarding the purposes of the strike provides compelling evidence of an unlawful job replacement objective. In his October 3 telex to all members working for the companies, MMP president Robert Lowen ordered them to cease all work except that necessary for the security of the vessel. The work stoppage included all grievance adjustment activities normally performed by the LDOs. Lowen also told MMP members to refuse to leave their ships voluntarily in order "to protect your jobs." In an October 5 message to MOC vessels reporting on the success of the strike, Lowen stated that the union "will succeed in restoring its membership to their rightful jobs and conditions." In a separate October 5 telex to all offshore ports, Lowen called upon the membership to "do [the] utmost to stop the flow of replacements to the ships being affected by our job action." While we could cite many other similar statements made by MMP officials, we believe that these three examples sufficiently and explicitly demonstrate that MMP's strike had as one of its objectives the replacement of non-MMP LDOs with MMP members, an objective that MMP itself concedes violates the statute with respect to masters and chief mates.
 
 
 21
 Despite its inability to satisfactorily explain these statements, MMP argues that there is insufficient evidence to support either of the two prongs of the replacement objective for the strike identified by the Board. As to the first prong--the desire to restore job rights to MMP members whom the companies had replaced with non-MMP LDOs--the union contends that because Mormac, Keystone, and MOC had succeeded in getting virtually all their LDOs to agree to the new employment offers, this type of replacement objective could not have motivated the strike and picketing against those three companies. Even though approximately forty of MTL's seventy-three LDOs had been replaced by non-MMP members, the union argues that the desire to restore MMP members to these positions did not motivate the strike, even against MTL. The union suggests that because the strike against all four companies was begun at the same time according to common instructions, an objective would have to be relevant to all companies to run afoul of the statute. We cannot accept this reasoning, however. We prefer to rely on the October 5 telexes mentioned above in which MMP's president explicitly identified restoration of jobs to MMP members as a strike objective. There is no evidence that this job protection purpose excluded positions which performed the admitted functions of grievance adjustment. We thus believe the first prong of the replacement objective has adequate support in the record.
 
 
 22
 We also find adequate support for the other prong of the replacement objective identified by the Board--that MMP sought to prevent the companies from discharging MMP members from LDO positions. MMP attempts to dispute this in several ways. First, it argues that the companies themselves wanted to retain their MMP LDOs, not discharge them. This argument, however, fails to recognize that the companies wanted to retain the LDOs only at the revised wage and benefit rates, and that the companies did not hesitate to discharge those MMP LDOs who refused to work during the strike. MMP also contends that its issuance of orders to its members not to leave their vessels unless forcibly removed was in no way meant to hinder the discharge and replacement of the workers. Again, it is difficult to reconcile MMP's current argument with Lowen's October 5 exhortation to members to "do [your] utmost to stop the flow of replacements." MMP also claims that its members' refusals to leave the ships did not disrupt the work of their replacements, but this is flatly contradicted at several points in the record. In sum, we are satisfied that the evidence supports the Board's conclusion that the strike was designed both to assist the restoration of MMP members to their jobs and to hinder the discharge of such members from LDO positions.
 
 B.
 
 23
 The Board's finding that the picketing was motivated by an unlawful replacement objective is likewise supported by substantial evidence. The ALJ, whose reasoning on this point was adopted in its entirety by the Board, provides exhaustive documentation for his finding that the picketing had a replacement objective, and we again will only mention the most persuasive pieces of evidence supporting the finding.
 
 
 24
 Picketing of all four companies began in mid-October at the direction of MMP's headquarters, which closely monitored the picketing throughout. Though some of the picket signs referred only to substandard wages and benefits paid by the companies, many other signs used language that supports the finding of an unlawful job replacement objective with respect to the function of grievance adjusters. For example, numerous ships were picketed with signs accusing the companies of locking out MMP members. Other signs demanded that the companies "stop union busting." Many signs used against Keystone vessels demanded that the company "put competent deck officers back on your ships." Another sign asked individuals crossing the picket line, "why are you helping to destroy M.M. & P?" Looking to these signs and other similar ones, the ALJ, as affirmed by the Board, concluded that they indicated an objective to restore union members to the LDO positions.
 
 
 25
 The ALJ also looked to several other pieces of evidence to bolster his conclusion that the picketing had an illegal replacement objective. As an illustration, the ALJ pointed to several statements by picketers that their objective was to get their jobs back. Handbills were distributed by MMP members on a few occasions, and these handbills either explicitly or implicitly demanded assistance in restoring MMP members to the LDO positions. The ALJ also noted the substantial overlap between the strike and picketing, exemplified by the fact that picketing sites authorized by MMP were located where the strike was taking place. In a similar vein, at least one update about the strike's progress issued by MMP also reported on the success of the picketing. For these and other reasons, the ALJ reached the conclusion that the picketing was motivated by a replacement objective. We find that substantial evidence supports this finding, and we affirm the Board's ruling that the picketing violated § 8(b)(1)(B) as it related to masters and chief mates.
 
 IV.
 
 26
 While we affirm the Board's finding of an unlawful replacement objective for the strike and picketing because it was supported by substantial evidence on the record as a whole, we do not find similar support on the record for the Board's conclusion that the second and third mates were not § 8(b)(1)(B) representatives. Over the dissent of Chairman Stephens, the Board reversed the ALJ's determination that second and third mates were grievance adjusters. The Board ruled that the personal disputes resolved by the second and third mates constituted only the exercise of supervisory authority, not grievance adjustment. We believe, however, that many of the grievances adjusted by second and third mates were contractual in nature, thereby making these individuals § 8(b)(1)(B) representatives irrespective of the formality of the procedures employed.[2]
 
 
 27
 A brief examination of the collective bargaining agreements for those unlicensed employees who presented complaints to the second and third mates will illustrate the contractual nature of the disputes. The bargaining agreements were exceedingly detailed in their coverage. Keystone's collective bargaining agreement with the NMU included intricate provisions regarding the timing and duration of coffee breaks and meal time. Thus, when second and third mates resolved frequent complaints from employees that they had not received the coffee or meal time to which they were entitled under the contract, this constituted grievance adjustment.
 
 
 28
 The contracts also devoted considerable attention to when employees would receive overtime pay, and the record is replete with instances of second and third mates resolving an employee's claim that he was entitled to overtime for the work he had performed. For example, MOC's contract with the SIU apparently required that overtime be paid whenever a crew member loaded stores from a distance exceeding twenty-five feet from the ship, and second and third mates frequently resolved employees' contentions that they had loaded stores from greater than twenty-five feet. The contracts also spelled out in detail the tasks required of each department on the ship and even of individual positions within the departments--also giving rise to grievances which the second and third mates had to adjust. As an illustration, the record reveals that the question of who should move laundry was often the subject of disputes brought to the second and third mates for resolution.
 
 
 29
 Moreover, the SIU and NMU contracts granted authority to second and third mates to adjust grievances. Both contracts provided that grievances would be presented on behalf of members of the crew by union representatives to the crewman's superior officer. The NMU contract called for initial presentation of grievances to the employee's "immediate superior"; similarly, the SIU contract stated that the complaint should be made to the employee's "superior officers." The ALJ found that the superior officer for the unlicensed employees on the companies' ships was the watch officer, and second and third mates composed the companies' contingent of watch officers. While the dissenting NLRB member believed that this contractual authority on the part of second and third mates to adjust grievances established that second and third mates were § 8(b)(1)(B) representatives, the majority took a different view of the effect of these provisions.
 
 
 30
 The majority believed that because a union representative, as opposed to the individual aggrieved employee, presented a grievance to a second or third mate on only one occasion, second and third mates were not actual grievance adjusters. While the machinery for grievance adjustment agreed to in the contracts may have been infrequently employed, we do not believe that fact deprives second and third mates of § 8(b)(1)(B) representative status. The contractually designated grievance procedures could have been called to life at any point a union representative decided to become formally involved at the first stage of a grievance. Moreover, if the Board waited to issue a cease and desist order against MMP until an NMU or SIU representative took formal action, the protection afforded the employer under the Act would likely be minimal. If MMP had free rein to engage in coercive activities prior to invocation of the contract's formal procedures, it might have succeeded in directing the process of grievance adjustment by forcing the companies to place union members in charge of the most basic contractual dispute resolution. We, therefore, agree with the Board's dissenting member that the presence in the two collective bargaining agreements of provisions authorizing second and third mates to adjust grievances qualifies those individuals as § 8(b)(1)(B) grievance adjusters.
 
 
 31
 More fundamentally, we are unwilling to accept the NLRB's view that strict adherence to formal grievance procedures is necessary for a finding that § 8(b)(1)(B) grievance adjustment has taken place. Indeed, the Board's own precedents undercut this insistence on unwavering conformity to formal procedures. In Sheet Metal Workers, Local 68, the Board confronted a situation where disputes were often presented to an employee's immediate supervisor without resort to the more formal route of having the union's job steward meet with a more senior employer representative to resolve the grievance. In rejecting the argument that the immediate supervisors were not grievance adjusters, the Board stated:
 
 
 32
 [T]he fact that [supervisors] resolve grievances at a fairly low level--before they become either particularly memorable or subject to the formalities of higher steps of the grievance procedure--does not mean that the [supervisors] are not resolving grievances as that term is used in Section 8(b)(1)(B). As the Supreme Court has observed in another context, "there is unlikely to be a bright-line distinction between an incipient grievance, a complaint to an employer, and perhaps even an employee's initial refusal to perform a certain job that he believes he has no duty to perform." An important interest that Congress was protecting in Section 8(b)(1)(B) was an employer's interest in having an individual of its own choosing to represent it in dealings with the union that represents its employees.... Thus, the view that no real grievance adjustment within the meaning of Section 8(b)(1)(B) could occur until a dispute reached the level of a formal meeting between an employer representative and the Respondent's business agent simply ignores the realities of the workplace.
 
 
 33
 298 NLRB No. 152, slip op. at 11-12 (quoting NLRB v. City Disposal Systems, 465 U.S. 822, 836, 104 S.Ct. 1505, 1513, 79 L.Ed.2d 839 (1984)) (emphasis added). In the instant case, union representatives did not typically get involved in grievance procedures unless the grievance was taken to a master or chief mate for resolution. The ALJ noted, however, that resolution of the apparently minor grievances by the second and third mates was important to "maintain[ing] the industrial peace" aboard the companies' ships. The companies were not obliged under the Act to transfer the resolution of these disputes aboard their ships solely to MMP members. We thus hold that the concept of § 8(b)(1)(B) grievance adjustment is broad enough to encompass resolution of contractually based disputes presented to second or third mates directly by the complaining employee. Accordingly, we reverse the NLRB's determination that second and third mates exercised only supervisory authority and did not qualify as grievance adjusters.
 
 
 34
 Because the second and third mates were grievance adjusters, the strike and pickets which had the objective of replacing non-MMP second and third mates with MMP members should have been enjoined as violations of § 8(b)(1)(B) in the same way that those regarding masters and chief mates were enjoined.
 
 V.
 
 35
 We next address the Board's rulings on the legality of disciplinary action undertaken by MMP against its members who disregarded the strike or picketing orders. Looking to NLRB v. International Brotherhood of Electrical Workers, Local 340 (Royal Electric), 481 U.S. 573, 107 S.Ct. 2002, 95 L.Ed.2d 557 (1987), the Board determined that an actual purpose of the disciplinary action was interference with the employers' selection of § 8(b)(1)(B) representatives and thus upheld the ALJ's ruling that the fines against the masters and chief mates violated § 8(b)(1)(B). Believing, however, that Royal Electric required that the fined individual be a § 8(b)(1)(B) representative in order for the fine to violate the statute and that neither second nor third mates nor pilots were § 8(b)(1)(B) representatives, the Board overturned the ALJ's ruling that the fines against second and third mates and pilots were unlawful. The Board did state, though, that MMP's "clear objective" in taking all the disciplinary action was "to coerce the [companies] either to fail to replace or to rehire [MMP] members as their licensed deck officers."
 
 
 36
 The starting point for our analysis must, of course, be the language of the statute, and it prohibits union efforts "to restrain or coerce ... an employer in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances." 29 U.S.C. § 158(b)(1)(B). One would be hard-pressed to imagine any union action more clearly violative of that provision than the union's disciplinary actions in this case. As we have already discussed, we accept the Board's finding that MMP's strike and picketing were motivated by an illegal replacement objective. We likewise accept the Board's finding that all the disciplinary threats and action were motivated by such a replacement objective. We think, however, that the Board failed to appreciate the import of its own findings. The fines levied by the union were plainly part of an integrated campaign of coercion against the companies in their selection of § 8(b)(1)(B) representatives. As such, they should have been held to violate the statute.
 
 
 37
 The Board contends, however, that union disciplinary action constitutes only "indirect coercion" whereas striking and picketing constitute "direct coercion" upon the companies' choice of their representatives. We do not believe the dichotomy is quite so neat. In those cases relied on by the Board, the "indirectly" coercive effects upon the employers stemmed from the potential of the discipline to cause § 8(b)(1)(B) representatives to perform their duties without the full loyalty typically given by such representatives to employers. See Royal Electric, 481 U.S. at 587, 107 S.Ct. at 2011; American Broadcasting Cos. v. Writers Guild of America, West, Inc., 437 U.S. 411, 429, 98 S.Ct. 2423, 2433, 57 L.Ed.2d 313 (1978) (ABC ); Florida Power & Light Co. v. International Bhd. of Electrical Workers, Local 641, 417 U.S. 790, 805-06, 94 S.Ct. 2737, 2745-46, 41 L.Ed.2d 477 (1974). In neither Florida Power, ABC, nor Royal Electric was the discipline undertaken with the objective of restraining the actual selection of § 8(b)(1)(B) representatives as is the case here. Quite to the contrary, in Florida Power and ABC, the discipline stemmed from employee actions taken during economic strikes that in no way sought replacement of § 8(b)(1)(B) representatives, and the discipline in Royal Electric stemmed from violation of union rules by employees of a company with which the union neither had nor sought a bargaining relationship. In these contexts, one can readily understand why the coercive effects upon employers' selection of § 8(b)(1)(B) representatives would be deemed "indirect" and thus less likely to be held impermissible.
 
 
 38
 We do not believe, however, that the Supreme Court intended its holding in Royal Electric to mandate monolithic treatment of all union discipline alleged to violate § 8(b)(1)(B). Rather, the Court sought to preclude a finding of § 8(b)(1)(B) violations in cases where the relationship between union discipline and an employer's selection of its grievance adjusters was "attenuated." 481 U.S. at 589, 107 S.Ct. at 2012. That charge cannot realistically be leveled at the discipline in this case. The disciplinary actions were clearly intended to cause the companies' grievance adjusters to fear heavy fines and other reprisals unless they both obeyed the union's strike orders and attempted to thwart any efforts on the part of the companies to replace them.
 
 
 39
 We cannot see why the disciplinary fines in this case should be viewed as any less coercive than, for example, the picketing. The real coercive effect of the picketing on the companies comes from its effect on third parties: by getting other individuals, whether they be members of the union or otherwise, to refuse to cross the picket lines, the union hoped to cripple the ability of the companies to conduct their everyday business and thereby force them to capitulate to an unlawful objective. In the case of the fines against union members not complying with the strike or picket orders, MMP had a similar purpose: to get these individuals to refuse to work for the companies, thereby increasing the economic pressure on the companies to select only MMP members as § 8(b)(1)(B) representatives. To hold there is a difference under the statute between picketing and discipline would lead to the anomalous result that MMP would be held in violation of § 8(b)(1)(B) for setting up a picket line designed in part to discourage pilots from crossing it, but that MMP would not be held in violation of the statute for fining pilots for crossing that same picket line. Both the picketing and discipline entailed restraint or coercion of the employer's selection of § 8(b)(1)(B) representatives. Therefore, in cases where union disciplinary action is an adjunct to other activities that clearly violate § 8(b)(1)(B), the plain language of the statute demands that the disciplinary action also be held to violate the section.
 
 
 40
 The Board and at least one circuit court have adopted a similar analysis in interpreting another section of the statute that uses "restrain or coerce" language similar to that in § 8(b)(1)(B). Section 8(b)(4)(ii)(B) forbids unions from taking actions which "threaten, coerce, or restrain" any person in an industry affecting commerce where an object of such union activity is to engage in a secondary boycott. 29 U.S.C. § 158(b)(4)(ii)(B). In Carpenter's Dist. Council of S. Colo., 222 NLRB 613 (1976), the Board, having found that certain picketing violated § 8(b)(4)(ii)(B), held that fines that were an adjunct of the picketing also violated the section. Id. at 613, 618; accord Mississippi Gulf Coast Bldg. & Constr. Trades Council, 222 NLRB 649, 650, enf'd without opinion, 542 F.2d 573 (5th Cir.1976). Similarly, the Ninth Circuit held that "when Congress used 'coerce' in Section 8(b)(4)(B) it did not intend to proscribe only strikes or picketing, but intended to reach any form of economic pressure of a compelling or restraining nature." Associated Gen. Contractors of Cal., Inc. v. NLRB, 514 F.2d 433, 438 (9th Cir.1975). We see no reason that this same approach should not be carried over to § 8(b)(1)(B).
 
 
 41
 We thus affirm the Board's order enjoining further discipline against masters and chief mates for failure to comply with MMP's strike or picketing orders. We also affirm the Board's order rescinding the prior discipline against and refunding all fines paid by masters and chief mates. We reverse the Board's determination that second or third mates and pilots did not qualify for similar relief from discipline. Simply put, the disciplinary actions taken by MMP were part of its overall scheme to coerce the companies in their selection of § 8(b)(1)(B) representatives, and all such actions consequently violate § 8(b)(1)(B).
 
 VI.
 
 42
 The companies claim that the NLRB erred by refusing to reach the question of whether other objectives animating the strike and picketing by MMP violated § 8(b)(1)(B). MMP admits that it sought through the strike and picketing to gain recognition, to achieve a collective bargaining agreement, and to gain adherence to area labor standards. The Board found, and we have affirmed, that all strike and picketing activity at issue in this case was motivated at least in part by an illegal replacement objective. The Board's remedial order, as amended to reflect our holding that second and third mates are grievance adjusters, will not allow MMP to reinitiate the same strike or picketing against the companies that has been held here to violate the statute. The companies, however, ask this court to go further and rule on the hypothetical question of whether union striking or picketing activity motivated by only the three above objectives would violate § 8(b)(1)(B). We recognize that the discussion in the foregoing sections with respect to the purposes of § 8(b)(1)(B) is not unrelated to the question of the legality under § 8(b)(1)(B) of the other objectives that motivated the union's actions in this case. Neither the ALJ nor the Board, however, had the opportunity to consider this question in the context of real world facts. We agree, therefore, with the Board that this question should not be decided in this litigation because to do so would force the court to render an advisory opinion, something not within our power to do. See, e.g., North Carolina v. Rice, 404 U.S. 244, 246, 92 S.Ct. 402, 404, 30 L.Ed.2d 413 (1971).[3]
 
 VII.
 
 43
 For the foregoing reasons, this case is remanded to the Board with directions to amend its order in accordance with this decision.
 
 
 44
 ENFORCED IN PART; REMANDED IN PART.
 
 
 
 [1]
 MMP had had collective bargaining agreements covering LDOs with MTL for approximately 40 years, with Keystone for 30 years, with MOC for 20 years, and with Mormac for over five years
 
 
 [2]
 By resting our decision on the fact that the grievances which were adjusted by second and third mates were often contractually based, we need not reach the question of whether or when purely personal grievances fall within the ambit of § 8(b)(1)(B) grievance adjustment
 
 
 [3]
 Because we believe that the Board properly declined to decide the legality of the other objectives under § 8(b)(1)(B), there is no need for this court to reassess in light of Royal Electric the continuing validity of several earlier cases, in which MMP was a party, involving the legality of the other objectives. See International Org. of Masters, Mates & Pilots v. NLRB (Cove Tankers), 575 F.2d 896 (D.C.Cir.1978); Newport Tankers Corp. v. NLRB, 575 F.2d 477 (4th Cir.1978); International Org. of Masters, Mates & Pilots v. NLRB, 539 F.2d 554 (5th Cir.1976); International Org. of Masters, Mates & Pilots v. NLRB (Marine & Marketing Int'l Corp.), 486 F.2d 1271 (D.C.Cir.1973)