GORSUCH, Circuit Judge,
concurring in part and dissenting in part:
I agree with much more of the court’s very fine opinion than not, and I join all but its discussion whether Mr. Hooks enjoyed a constitutional right to counsel at his post-conviction Atkins proceeding, see Maj. Op. § II.C.5.a, and its holding that Mr. Hooks’s counsel was constitutionally ineffective at the sentencing phase of his original trial, see Maj. Op. § II.D.2.
I
On the first score, Mr. Hooks argues that he did not receive effective assistance from his appointed counsel at the post-conviction Atkins proceeding convened to determine whether he is mentally retarded. See Atkins v. Virginia, 536 U.S. 304, 321, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). In reply, and after a careful examination of counsel’s performance, my colleagues hold that any plausibly applicable constitutional standard for effective representation was satisfied. See Maj. Op. § II.C.5. With this holding I agree.
But because I agree with this much, I would decline Mr. Hooks’s invitation to address the novel constitutional question whether a right to counsel exists in post-conviction Atkins proceedings, a question my colleagues take up in § II.C.5.a. I would decline to offer an opinion on this question because there is no need to do so and many reasons to hesitate.
Caution is always warranted when venturing down the road of deciding a weighty question of first impression and recognizing a previously unrecognized constitutional right. And surely caution must be doubly warranted when nothing turns on it. After all, “[a] fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them.” Lyng v. Nw. Indian Cemetery Protective Assn., 485 U.S. 439, 445, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988); see also Burton v. United States, 196 U.S. 283, 295, 25 S.Ct. 243, 49 L.Ed. 482 (1905) (“It is not the habit of the court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case.”); NLRB v. Int'l Bhd. of Elec. Workers, 481 U.S. 573, 591 n. 15, 107 S.Ct. 2002, 95 L.Ed.2d 557 (1987) (separately noting that a statement “unnecessary to the disposition” is “dictum”); United States v. Villarreal-Ortiz, 553 F.3d 1326, 1328 n. 3 (10th Cir.2009) (same). And given all members of the panel agree with certainty and comparative ease that Mr. Hooks’s *1209 claim fails even assuming a constitutional right to counsel exists in a post-conviction Atkins proceeding, offering any view on whether such a new constitutional right should be recognized is simply unnecessary in this case.
Adding caution to caution to my mind is the fact it’s not obvious an opinion on the question Mr. Hooks poses will ever be necessary. Today, Atkins challenges are routinely handled before or at trial with the constitutionally assured aid of counsel. Mr. Hooks’s Atkins claim was presented on collateral review only because Atkins issued after his conviction became final and Atkins represents what this court has called one of the “rare instances in which the Supreme Court has announced a new rule of constitutional law that it has also expressly made retroactively applicable to cases on collateral review.” Ochoa v. Sirmons, 485 F.3d 538, 540 & n. 2 (10th Cir.2007). So it is that the number of cases like Mr. Hooks’s — applying Atkins in collateral proceedings and still working their way through the federal courts a decade later — surely isn’t overwhelming. And for that vestigial lot it isn’t clear whether we will ever have to decide whether the right to effective assistance of counsel attaches. As in this case, counsel in these other lingering cases very well may have been provided and themselves provided effective assistance. Of course, if and when the constitutional question actually makes a difference in one of these cases, I have no doubt this court will stand open to argument and ready to judge. But it’s unclear we will ever have to do so and it is clear we do not have to do so today.
Finally, my reluctance to reach the novel constitutional question is informed by the fact that it is pitted with problems. Those problems begin with the fact our approach to the question in this particular case comes by way of AEDPA, as my colleagues acknowledge. So the question before us isn’t “just” whether to recognize an entirely new constitutional right to counsel in post-conviction Atkins proceedings. It’s whether such a right is already “clearly established” by the holdings of the United States Supreme Court. 28 U.S.C. § 2254(d)(1).
And for his part, Mr. Hooks fails to explain how we might confidently say so much. After all, when it comes to post-conviction habeas proceedings, the Supreme Court’s teachings have been consistent, clear, and categorical — holding that a constitutional right to counsel does not exist. Murray v. Giarratano, 492 U.S. 1, 10, 109 S.Ct. 2765, 106 L.Ed.2d 1 (1989) (plurality); Pennsylvania v. Finley, 481 U.S. 551, 555, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987). Time and again, the Supreme Court has told us that “the right to appointed counsel extends to the first appeal of right, and no further.” Finley, 481 U.S. at 555, 107 S.Ct. 1990. Post-conviction review, the Court has explained, simply “is not part of the criminal proceeding itself, [but] is ... civil in nature,” id. at 557, 107 S.Ct. 1990, and the Sixth Amendment’s right to counsel simply “does not govern civil cases,” Turner v. Rogers, — U.S. -, 131 S.Ct. 2507, 2516, 180 L.Ed.2d 452 (2011). So, far from contradicting Supreme Court holdings, the idea that Mr. Hooks lacked a Sixth Amendment right to counsel in the course of a post-conviction Atkins proceeding seems, at least on first blush, entirely consistent with (maybe even compelled by) Supreme Court precedent.[1]
*1210 To be sure, Mr. Hooks seeks to avoid the force of all this adverse precedent by asking us to recharacterize his post-conviction proceeding as a part of his original criminal prosecution. He begins by noting that he couldn’t have brought his Atkins claim until after conviction. And because of this — because his habeas petition represented the first place he could’ve brought his Atkins claim — he suggests his Atkins proceeding should not be treated as a post-conviction proceeding at all. Instead, he says, we should recharacterize it as a preconviction criminal proceeding where the Sixth Amendment and its right to counsel automatically attaches.
The difficulty here is Mr. Hooks doesn’t explain how this recharacterization process is clearly compelled by Supreme Court precedent. In deciding whether to apply a new constitutional rule retroactively, the Supreme Court has always spoken of the question as whether the new rule should apply “to cases on collateral review.” See, e.g., Teague v. Lane, 489 U.S. 288, 300-10, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989); see also Ochoa, 485 F.3d at 540 (“Atkins ... [is] retroactively applicable to cases on collateral review.” (emphasis added)). Neither is the fact an important and potentially winning federal claim can be brought only in habeas ordinarily enough to undo a conviction and transmogrify a habeas proceeding back into a pre-conviction criminal proceeding. If the rule were otherwise — if the world were as Mr. Hooks suggests it should be — habeas petitioners would have a constitutional right to post-conviction counsel not just for Atkins claims but also for Strickland claims aimed at appellate counsel or for Brady claims based on newly discovered evidence. And that, of course, is not the law. See Finley, 481 U.S. at 555, 107 S.Ct. 1990. All this suggests that the retroactivity of a new rule applied on collateral review doesn’t strip a case of its finality and post-conviction status unless and until the new rule or its application requires that the petitioner’s conviction or sentence be set aside. Certainly and at the least, Mr. Hooks identifies no clearly established law of the Supreme Court holding otherwise.
This leaves Mr. Hooks to reply only that, if the Sixth Amendment doesn’t clearly compel counsel, the Due Process Clause might. But here again unexplained complications soon emerge. The Due Process Clause applies to all kinds of proceedings — including other post-conviction proceedings, see, e.g., Dist. Attorney’s Office for the Third Judicial Dist. v. Osborne, 557 U.S. 52, 69, 129 S.Ct. 2308, 174 L.Ed.2d 38 (2009)—without compelling a right to counsel. To be sure, Mr. Hooks suggests his case is different because an intellectually disabled death row inmate won’t as a practical matter be able to press an Atkins claim without the benefit of counsel. But the Supreme Court in Murray expressly rejected the notion that death row prisoners have a due process right to post-conviction counsel, and the Court did so well aware that appointed counsel is not infrequently the practical difference between success and failure in securing post-conviction relief. See 492 U.S. at 14-15, 109 S.Ct. 2765 (Kennedy, J., concurring in the judgment). Take, for example, the winning ineffective assistance of counsel claim in Mr. Hooks’s own case. Today, the court sets aside Mr. Hooks’s death sentence after concluding he was denied effective assistance of counsel at the sentencing phase of his original trial. It is difficult, maybe impossible, to imagine how Mr. Hooks would have been able to bring such a highly complex claim without the assistance of post-conviction counsel. Yet, no one suggests due process guaranteed Mr. Hooks the right to post-conviction counsel to bring that claim. Now, maybe there’s some way to distinguish away all other complex post-conviction claims and treat Atkins claims uniquely. *1211 But Mr. Hooks never explains to us how a contrary view, one consistent with the Court’s existing direction in Murray, might be overturned under AJEDPA as an unreasonable application of existing Supreme Court precedent.
In raising these concerns, I hardly mean to suggest that competent counsel shouldn’t be provided in the lingering cases where Atkins is enforced through collateral proceedings. Indeed, counsel in these circumstances clearly serve a critical function, and the State of Oklahoma recognized as much by providing Mr. Hooks with a lawyer in his Atkins proceeding. A lawyer who, this court acknowledges, met every standard the Constitution might conceivably command even in a pre-conviction setting. See Murray, 492 U.S. at 14-15, 109 S.Ct. 2765 (Kennedy, J., concurring in the judgment) (observing that “[t]he requirement of meaningful access can be satisfied in various ways,” including through state initiatives like Oklahoma’s, and that “judicial imposition of a categorical remedy ... might pretermit [similarly] responsible solutions being considered in Congress and state legislatures.”). Neither in raising these concerns do I mean to indicate how this court should rule if and when the question of constitutional right actually matters. I simply and respectfully mean to explain only the many and varied reasons that cause me to hesitate about venturing an opinion today on a constitutional question when its answer does not matter.
II
My other point of departure from the court’s thorough opinion is its conclusion that Mr. Hooks’s trial counsel was constitutionally ineffective at the sentencing phase of his original trial. See Maj. Op. § II.D.2. As my colleagues observe, our review on this question is de novo because the state courts never passed on its merits. Even so, I agree with the district court’s assessment that counsel’s alleged deficiencies did not prejudice Mr. Hooks. Like the district court, I would hold that there is no “reasonable probability” that, had counsel acted just as Mr. Hooks now wishes, the jury “would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.” Strickland v. Washington, 466 U.S. 668, 695, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
Mr. Hooks first complains that counsel failed to produce certain evidence about his family history. But that history is a mixed bag for him. Mr. Hooks says, for example, that the jury should have learned his father abused him. But the evidence of abuse is based on testimony that Mr. Hooks’s father disciplined him by spanking him with a belt and, on one occasion, when Mr. Hooks was talking while his father was attempting to say grace before a meal, his father smacked him very hard in the mouth. Fed. Evid. Hr’g at 14-15. According to Mr. Hooks himself, for the most part he had a “great” relationship with his father and “liked to be around him.” Id. at 44, 47. And Mr. Hooks’s mother remembered her husband generally as a “wonderful person” and “excellent provider.” Id. at 11. Mr. Hooks separately but relatedly complains that the jury didn’t hear about his premature birth, his father’s death in a car crash and his half-brother’s death in a motorcycle accident, his father’s abuse of his mother, or his family’s frequent moves and the difficulty he had in school. But these difficulties, too, while no doubt very real, are a far cry from the sort of “nightmarish” personal histories that courts have faulted counsel for failing to illuminate at trial. Williams v. Taylor, 529 U.S. 362, 395 & n. 19, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); see also Wiggins v. Smith, 539 U.S. 510, 516—17, 534-35, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (discussing unproduced evidence of “physical torment, sexual molestation, and *1212 repeated rape” as well as the fact that the defendant’s “mother, a chronic alcoholic, frequently left [the defendant] and his siblings home alone for days, forcing them to beg for food and to eat paint chips and garbage”); Rompilla v. Beard, 545 U.S. 374, 391-92, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005) (discussing unproduced evidence the defendant suffered fetal alcohol syndrome, was mentally retarded and repeatedly beaten, and suffered an extraordinarily deprived childhood).
Given the comparatively equivocal nature of the unproduced evidence in this case, it is hard to see how it would have mitigated for anyone on the jury the fact Mr. Hooks brutally beat his pregnant wife to death over the course of approximately two hours, leaving her body barely recognizable and his unborn child dead. Or how it would have offset the other aggravating evidence that Mr. Hooks previously robbed a liquor store and routinely beat his wife and two other girlfriends, causing (another) one of them to have a miscarriage. Much more likely, any attempt to blame Mr. Hooks’s crimes on his surely imperfect but not particularly unusual childhood would have done him more harm than good with the jury.
The same sort of problem recurs with all the other facts Mr. Hooks now says his lawyer should have presented.
After the prosecution presented aggravating evidence about his liquor store robbery, Mr. Hooks says his trial counsel should have introduced evidence that he (Mr. Hooks) confessed the crime to his mother, who then forced him to turn himself in. But none of this undermines the fact that Mr. Hooks committed the robbery, or suggests he would have confessed without his mother’s influence. And much of the other testimony that Mr. Hooks claims his mother could have provided about the robbery — that Mr. Hooks didn’t bring any gun to the robbery but found one in the store and took it home, and that the clerk cut her hand “accidentally” when Mr. Hooks knocked a knife lying on the counter onto the floor — would have been inadmissible hearsay, and some of it of questionable credibility at that.
When it comes to the mitigating evidence about his mental health, Mr. Hooks faults his counsel for calling Dr. Murphy to testify that he suffered from severe mental illnesses instead of another psychologist who would have diagnosed organic brain damage. It’s doubtful, however, if this amounted even to deficient performance, given that it appears Dr. Murphy was virtually the only available psychiatrist willing to testify. Fed. Evid. Hr’g at 175. But even assuming the performance here was deficient, it’s still hard to see how a diagnosis of organic brain damage would have been materially more helpful than the mental health evidence Dr. Murphy offered. Dr. Murphy testified, after all, that Mr. Hooks was “borderline mentally retarded” and that he suffers from a chronic psychotic disorder. 3 Trial Tr. at 518-22, 528. The doctor explained that this disorder causes Mr. Hooks to have “recurrent repeated episodic breaks with his ability to tell reality from fantasy.” Id. at 518, 521-22. Dr. Murphy then expressly proceeded to “connect the dots” between this mental illness and Mr. Hooks’s murder. He testified that, given Mr. Hooks’s chronic psychotic disorder, it was very unlikely Mr. Hooks could have murdered Ms. Blaine “in a fully rational, cold-blooded, premeditated fashion.” Id. at 529. And he suggested that, at the time of the murder, Mr. Hooks must have been in a “catatonic” and “extremely regressive state” which caused him to have poor impulse control and left him less than competent. Id. In light of all this, it’s hard to see how Mr. Hooks might have been aided significantly by a diagnosis of organic brain damage. In fact, testimony along those lines would *1213 have been seriously suspect (and so potentially harmful to Mr. Hooks) given that medical records from a 1982 hospitalization — long after the car accident which, along with Mr. Hooks’s premature birth, allegedly caused organic brain damage— disclose that the doctors found no evidence of organic brain injury. Id. at 582-34.
Mr. Hooks separately asserts that Dr. Murphy’s testimony was ineffectual because the doctor “knew almost nothing about Mr. Hooks’s case.” Maj. Op. at 1204. But while Dr. Murphy admitted that he had not read the police reports or viewed Mr. Hooks’s videotaped confession, these are hardly the only ways of learning about Mr. Hooks’s crime. In fact, Dr. Murphy’s testimony reflects that he discussed the crime both with Mr. Hooks and with trial counsel and knew all the pertinent details. 3 Trial Tr. at 458-59, 527, 531. Similarly, Mr. Hooks complains that Dr. Murphy’s testimony was undercut by his statements that Mr. Hooks would, at times, become “crazy” and “violent.” But Mr. Hooks was undeniably “very, very violent” when he beat his wife to death, and it was a perfectly reasonable — even a wise— mitigation strategy to have Dr. Murphy admit this fact and argue the behavior was attributable to Mr. Hooks’s mental illness and incompetence rather than a product of deliberation.
Much the same holds true with his counsel’s acknowledgment during the sentencing phase that Mr. Hooks was a dangerous person. Mr. Hooks complains that his counsel shouldn’t have admitted as much. But counsel has explained that it was his strategy to make this admission in an attempt “to build some credibility with the jury,” Fed. Evid. Hr’g at 194, and Mr. Hooks has failed to overcome the “strong presumption” that this strategy was reasonable. See Strickland v. Washington, 466 U.S. 668, 689, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). By this point in the trial, after all, counsel faced a mountain of evidence (a murder conviction and much evidence of other violence) suggesting Mr. Hooks often resorted to brutal force. It wasn’t unreasonable for counsel to acknowledge the unavoidable and then seek to defuse it by explaining how and why it didn’t warrant the death penalty. And that’s exactly what counsel did. Immediately after acknowledging his client’s violent tendencies, counsel argued they were the product not of malicious deliberation but mental illness. 3 Trial Tr. at 505. And counsel then proceeded to remind the jury that if they remained concerned, they had the option of life without parole, arguing that Mr. Hooks wouldn’t be a threat in prison because he had no problems with fellow prisoners or guards during a previous incarceration. Id. This strategy — acknowledging the facts and seeking to work faithfully within their parameters to suggest reasons why the death penalty isn’t warranted — surely amounts to reasonable professional conduct. It would do a great deal more to undermine than advance the Sixth Amendment’s right to effective assistance to require lawyers to become ostriches and feign ignorance of the facts before the jury or risk being held incompetent. All of us lawyers and judges, after all, have to work with the hard facts as well as the easy ones. See Hooker v. Mullin, 293 F.3d 1232, 1246-47 (10th Cir.2002) (counsel not deficient in stipulating to two aggravating circumstances that the jury would have found anyway when this concession was a strategic decision to preserve credibility).
These are all the alleged deficiencies of trial counsel Mr. Hooks cites in his effort to overturn his death sentence. There are no more. Respectfully, I agree with the district court that they are not sufficient to warrant displacing the jury’s considered *1214 sentence and I would affirm the district court’s decision in full.

. In Martinez v. Ryan, - U.S. -, 132 S.Ct. 1309, 182 L.Ed.2d 272 (2012), the Court recently held that the lack of counsel in post-conviction proceedings can, in certain circumstances, constitute cause to excuse a procedural default. But Martinez did not displace Murray and Finley’s rule that appointment of counsel is not constitutionally compelled in collateral proceedings. Id. at 1315.